# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 05-3316

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Roy J. Hudspeth, | * | |
| | * | |
| Appellant. | * | |

———————

Submitted: February 15, 2006
Filed: August 25, 2006

———————

Before RILEY, HEANEY, and MELLOY, Circuit Judges.

———————

MELLOY, Circuit Judge.

Roy Hudspeth (Hudspeth) entered a conditional guilty plea to possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5) and (b)(2) (2000). The district court sentenced Hudspeth to sixty months' imprisonment. Hudspeth appeals, challenging the district court's denial of his motion to suppress and application of the Sentencing Guidelines. For the reasons set forth below, we affirm in part and reverse in part.

I.    BACKGROUND

On July 25, 2002, as part of an investigation into the sale of large quantities of pseudoephedrine-based cold tablets, the Missouri State Highway Patrol and the Combined Ozarks Multi-Jurisdictional Enforcement Team (COMET) executed a search warrant at Handi-Rak Service, Inc. (Handi-Rak).  The search warrant listed property to be seized including: "[a]ny and all papers and/or documents" related to "the stock and inventory of pseudoephedrine based cold tablets," "financial statements," "payment journals," "a customer list of clients receiving pseudoephedrine based cold tablets," "employee personnel files," "employee sales routes," and "the inventory in and out of pseudoephedrine based cold tablets."

Hudspeth, Handi-Rak's CEO, arrived at Handi-Rak after the search was underway.  Missouri State Trooper Corporal Daniel Nash (Cpl. Nash) informed Hudspeth of his Miranda[1] rights.  Hudspeth said he understood his rights.  Hudspeth then agreed to answer some questions and denied wanting to talk to a lawyer, stating, "I don't think I've done anything wrong and I just want to get this cleared up."

Sergeant Michael Cooper (Sgt. Cooper) of the Missouri State Highway Patrol supervised the COMET team during the Handi-Rak search.  Missouri State Highway Patrol Mobile Crime Information Analyst Connie Farrow (Analyst Farrow), who was assigned to search Hudspeth's office, directed Sgt. Cooper's attention to the computer and compact disks (CDs) on Hudspeth's desk.  Sgt. Cooper selected a homemade CD with a handwritten label and directed Analyst Farrow to open a folder containing thumbnail images of graphics files.  The first image opened appeared to be adult pornography.  Sgt. Cooper then rapidly viewed more thumbnails and discovered several images containing obvious child pornography.  After discovering similar images on two or three other CDs, Sgt. Cooper stopped the search and called the United States Attorney's office for guidance.

_____

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

Sgt. Cooper informed Cpl. Nash about the discovery of child pornography. After Cpl. Nash obtained Hudspeth's oral and written consent to search the computer, Cpl. Nash asked Hudspeth about the images discovered by Sgt. Cooper. Hudspeth told Cpl. Nash he knew there was "guy stuff" on the computer and CDs, but Hudspeth said he did not know it was illegal. Hudspeth told Cpl. Nash he downloaded images from the Internet onto his office computer, and then burned the images onto CDs. Hudspeth refused to say whether he had downloaded similar images on his home computer. Cpl. Nash requested permission to search Hudspeth's home computer. Hudspeth refused to give Cpl. Nash permission. Cpl. Nash had Hudspeth placed under arrest and transported to the county jail.

Based on the totality of the circumstances, Cpl. Nash believed Hudspeth's home computer also contained child pornography. Cpl. Nash and three other officers went to the Hudspeth home. Georgia Hudspeth (Mrs. Hudspeth) was at home with the couple's children. Cpl. Nash introduced himself, showed Mrs. Hudspeth his identification, and identified the men with him as law enforcement officers. None of the officers were in uniform or carrying weapons. Mrs. Hudspeth permitted the officers to enter the house and sent the children to a back bedroom.

Cpl. Nash informed Mrs. Hudspeth they had arrested her husband after executing a search warrant at Handi-Rak and finding contraband on her husband's business computer. Cpl. Nash explained his concern that the home computer contained contraband. Cpl. Nash did not tell Mrs. Hudspeth that her husband refused to consent to the search of the home computer.

Mrs. Hudspeth and the officers discussed the family's two computers: one in the children's room and one in the garage. Cpl. Nash asked for permission to search the residence. Mrs. Hudspeth denied permission. Cpl. Nash then requested permission to take the computer in the garage. Mrs. Hudspeth said she did not know what to do and asked Cpl. Nash what would happen if she did not consent. Cpl. Nash told Mrs. Hudspeth he would leave an armed uniformed officer at the home to prevent

destruction of the computer and other evidence while he applied for a search warrant. Mrs. Hudspeth said she wanted to make a phone call, went into the kitchen, and tried unsuccessfully to contact her attorney. After a few minutes, Mrs. Hudspeth returned to the officers and gave her consent to take the computer. Cpl. Nash saw homemade CDs next to the computer similar to the ones found at Handi-Rak and asked Mrs. Hudspeth if he could take the CDs. Cpl. Nash testified Mrs. Hudspeth said yes, and Mrs. Hudspeth testified she did not tell the officers not to take the CDs. The entire visit lasted approximately thirty minutes.

The officers obtained a second search warrant authorizing the search of the seized computers and CDs from both the office and the home for child pornography. Prior to obtaining the second search warrant, officers looked at the contents of some of the disks seized from the home. The search uncovered images of child pornography obtained from computer-based newsgroups that Hudspeth downloaded to CDs, floppy disks, and the computers' hard drives. The investigators also found movie files of Hudspeth's stepdaughter appearing nude and in various stages of undress. Hudspeth surreptitiously recorded his stepdaughter by using a computer web camera.

Hudspeth was indicted on one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5) and (b)(2). Hudspeth filed a motion to suppress, which the district court denied. A second superseding indictment charged Hudspeth with an additional count of producing and attempting to produce child pornography, in violation of 18 U.S.C. § 2251(a) and (d). Hudspeth entered a conditional guilty plea to possessing child pornography, reserving the right to appeal the denial of his motion to suppress.

The district court sentenced Hudspeth on August 23, 2005, and used the advisory Guidelines[2] in calculating Hudspeth's sentence. Based on Hudspeth's surreptitious filming of his stepdaughter, the district court applied U.S.S.G. § 2G2.1 (trafficking material involving the sexual exploitation of a minor), which carried a higher base offense level, and imposed enhancements due to the stepdaughter's age and relationship to Hudspeth. After all adjustments, the Guidelines range was 121 to 151 months. Confined by the statutory maximum sentence of five years, see 18 U.S.C. § 2252A(b)(2) (2000), the district court sentenced Hudspeth to 60 months' imprisonment. Hudspeth appeals the district court's denial of his motion to suppress and its application of the Guidelines.

## II.    DISCUSSION

### A.    Motion to Suppress

Hudspeth argues the district court erred by not suppressing the evidence seized from his computers and CDs. "We review the district court's factual findings in support of its denial of a motion to suppress for clear error and its legal" conclusions de novo. United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005).

#### 1.    Search and Seizure of Business Computer

Hudspeth argues the district court erred in not suppressing the evidence seized from the search of his business computer because the officers impermissibly exceeded the scope of the search warrant, which only authorized the search of Handi-Rak's business records. Hudspeth also contends the officers exceeded the scope of Hudspeth's oral and written consent to search the business computer.

---

[2]Based on an offense conduct date of July 25, 2002, the district court sentenced Hudspeth under 18 U.S.C. § 2252A(b)(2), before Congress amended the statute in 2003, and used the Guidelines Manual effective November 1, 2001, pursuant to U.S.S.G. § 1B1.11(b)(1).

"The language of a search warrant must describe the items to be seized with sufficient particularity: 'the language must be sufficiently definite to enable the searcher to reasonably ascertain and identify the things authorized to be seized.'" United States v. Lowe, 50 F.3d 604, 607 (8th Cir. 1995) (quoting United States v. Saunders, 957 F.2d 1488, 1491 (8th Cir. 1992)). "[T]he requirement that a search warrant describe its objects with particularity is a standard of 'practical accuracy' rather than a hypertechnical one." United States v. Peters, 92 F.3d 768, 769-70 (8th Cir. 1996) (quoting Lowe, 50 F.3d at 607).

The language of the search warrant and the affidavit in support of the search warrant sufficiently demonstrate the search warrant anticipated the search of Hudspeth's business computer. First, the search warrant described the types of records to be searched as: "any and all" records or documents regarding sales, payables, inventory, customer lists, financial statements, and personnel files. While the inclusion of the word "computer" would have specified one location among several where the officers might look for those items, its omission did not prevent the officers from searching Hudspeth's business computer for such records. See Peters, 92 F.3d at 770 (concluding the use of the general term "records" in the search warrant "adequately covered the search of records in audio cassette form"); Lowe, 50 F.3d at 607 (holding a videotape fell within the scope of a search warrant authorizing the seizure of items including "[a]ddress books, photographs, and other items that tend to show co-defendants or co-conspirators," and "[i]tems of personal identification, such as letter [sic], utility bills, driver's licenses, passports, etc., to show constructive possession of any controlled substances found at the above described address"); United States v. Lucas, 932 F.2d 1210, 1215-16 (8th Cir. 1991) (concluding a search warrant authorizing the seizure of "[b]ooks, records, receipts, notes, ledgers and other papers relating specifically to the transportation, ordering, purchase and distribution of controlled substances" was sufficiently particular to include the seizure of an answering machine and its cassette tape because "the seizure of records refers to the 'generic class of records'"); see also United States v. Walser, 275 F.3d 981, 987 (10th

-6-

Cir. 2001) (concluding the officer did not exceed the scope of a search warrant authorizing the search of computer records for evidence of a drug transaction where the officer opened a homemade CD and discovered child pornography because the search warrant authorized the search of computer files).  In this computer age, a warrant to search business records logically and reasonably includes a search of computer data.

Next, officers involved in the initial search of the business computer testified they anticipated searching Hudspeth's business computer.  Analyst Farrow testified she was told the search warrant included computer records.  Sgt. Cooper testified based on his twenty-six years of law enforcement experience, he believed the search warrant covered the computer and CDs explaining, "when you're searching for records . . . especially at a business, . . . electronic records and computerized records are going to be part of records as a whole."  Sgt. Cooper also testified Hudspeth's computer was of particular interest because the types of records sought most likely would be in Hudspeth's office and not available to other employees.  Sgt. Cooper further explained his "assigned duty" was searching Hudspeth's business computer because Sgt. Cooper had knowledge of computer-archiving records as graphic images.

Finally, the affidavit of Drug Enforcement Administration Special Agent Tim Krisik (Agent Krisik) in support of the search warrant likewise anticipated a search of the business computer.  The affidavit detailed Cpl. Nash's investigation leading up to the application for the federal search warrant, which included interviews, controlled buys, and the execution of a state search warrant at Handi-Rak. Based on interviews with two Handi-Rak salespersons, Cpl. Nash had reason to believe Handi-Rak's sales personnel regularly sold pseudoephedrine-based cold tablets in excess of the legal limit and documented those sales with two separate invoices: one computer-generated, and the other handwritten.  Cpl. Nash also had reason to believe Hudspeth knew about the excess sales and kept those records in his Handi-Rak office.  The statements in the affidavit clearly demonstrate the investigators anticipated searching Hudspeth's office computer records for evidence of Handi-Rak's double-invoicing practice.

Relying on United States v. Carey, 172 F.3d 1268 (10th Cir. 1999), Hudspeth argues the officers' prolonged search exceeded the scope of his consent because Hudspeth consented to the search for business records only. In Carey, detectives arrested Carey, then secured Carey's consent to seize and search his home computers for evidence of drug trafficking. Id. at 1270. After obtaining a search warrant authorizing the search of records pertaining to drug trafficking, a detective downloaded the directories of both computers. Id. When the search of text-based files proved unsuccessful, the detective began viewing graphics files and discovered child pornography. Id. at 1271. At that point, the detective "temporarily abandoned" the search for evidence of drug-related documents "to look for more child pornography, and only 'went back' to searching for drug-related documents after conducting a five hour search of the child pornography files." Id. at 1273. The Tenth Circuit concluded the detective exceeded the scope of the warrant because he "was acting without judicial authority when he abandoned his search for evidence of drug dealing" and should have obtained a new search warrant authorizing the search for child pornography. Id. at 1273.

Unlike the circumstances in Carey, no such abandonment occurred here. Sgt. Cooper testified that after briefly viewing "two or three CDs" and finding more child pornography, he stopped his search "because [he] was seeing things that [he] wasn't expecting to see," and he called the United States Attorney's office for instructions. After seizing the business computer, Agent Krisik secured a second search warrant authorizing the search of Hudspeth's home and business computer hard drives and CDs for child pornography.

Furthermore, Hudspeth's assertion of limited consent is contradicted by the language of the consent given and his conduct following consent. Hudspeth gave consent to "search [his] computer located in his place of business," which indicates Hudspeth's consent was not limited to business records only. In addition, Hudspeth failed to object to the search or withdraw consent after Cpl. Nash told Hudspeth about the images discovered on the computer. Instead, Hudspeth acknowledged having the

images on the computer, referred to them as "guy stuff," and said he did not know they were illegal. We conclude the officers did not exceed the scope of Hudspeth's consent to search the computer, nor did Hudspeth's ignorance regarding the illegality of child pornography invalidate Hudspeth's consent.

### 2. Seizure of Home Computer

Hudspeth also challenges the validity of the warrantless seizure of the computer and CDs from his home. He argues that he expressly denied consent and that his wife's consent should not "overrule" his denial.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Subject to a few well-established exceptions, a warrantless search is per se unreasonable. United States v. Cortez-Palomino, 438 F.3d 910, 913 (8th Cir. 2006) (per curiam). Consent to search is a valid exception to the warrant requirement if the consent is knowingly and voluntarily given. United States v. Sanders, 424 F.3d 768, 773 (8th Cir. 2005). Whether consent was voluntary or the product of coercion "is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); United States v. Perry, 437 F.3d 782, 785 (8th Cir. 2006). "The government has the burden to establish . . . consent was freely and voluntarily given and not a result of duress or coercion." Laing v. United States, 891 F.2d 683, 686 (8th Cir. 1989). A showing of mere "acquiescence to a claim of lawful authority" will not discharge this burden. Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).

In assessing the voluntariness of consent, we look to the party's "age, intelligence, and education, whether or not he or she was intoxicated, whether he or she had been informed of his or her Miranda rights, and whether he or she had previous experience with the criminal justice system." United States v. Lee, 356 F.3d 831, 834 (8th Cir. 2003); see also Perry, 437 F.3d at 785. Considering these factors,

there was nothing coercive about the officers' conduct to render Mrs. Hudspeth's consent involuntary. The record shows that at the time of the search, Mrs. Hudspeth was in her mid-thirties and had three years of college education. Cpl. Nash described Mrs. Hudspeth as "a very confident woman." The Hudspeth's home was in a suburban, residential area, rather than a secluded or remote area. The officers arrived at the house around 7:00 p.m., unarmed and wearing street clothes. The Hudspeth children were in the house at the time, but Mrs. Hudspeth sent the children to a back bedroom before beginning any conversation with the officers. Although Mrs. Hudspeth became upset when Cpl. Nash informed her about her husband's arrest for possession of contraband, she regained her composure shortly thereafter, in part because she did not want to upset her children. Mrs. Hudspeth testified that the officers spoke quietly and her children were "pretty much unaware" of what was going on. When asked for permission to search the residence, Mrs. Hudspeth exercised her free will and refused permission.

The record demonstrates Cpl. Nash fully informed Mrs. Hudspeth she had a right to refuse when he asked permission to take the computer. On the other hand, Cpl. Nash also informed Mrs. Hudspeth if she did not consent, he would leave a uniformed officer at the home to prevent destruction of the computer or other evidence while he applied for a search warrant. Cpl. Nash accurately informed Mrs. Hudspeth of her right to refuse and his authority under the law. The record further indicates Mrs. Hudspeth was not restricted or detained by the officers. Mrs. Hudspeth left the officers in the living room, went into the kitchen to call her attorney, and walked around the house for a few minutes while considering whether to allow the officers to take the computer. The entire visit lasted about thirty minutes.

The only indication of involuntariness is Mrs. Hudspeth's testimony she told the officers to take the computer because Cpl. Nash "began to get upset" and Mrs. Hudspeth feared her children "might have a big fit." In addition to the fact the officers deny Cpl. Nash ever became upset, this testimony is in sharp contrast to Mrs. Hudspeth's other testimony that the officers "talked quietly and not loud," "[t]hey

weren't shouting," and her children were in the bedroom and "pretty much unaware" of the events transpiring. According to Mrs. Hudspeth, her controlling concern was to avoid upsetting her children. Mrs. Hudspeth's uncorroborated testimony she consented because of some vague, speculative fear is not sufficient to support the argument the officers coerced Mrs. Hudspeth's consent. Under the totality of all the circumstances, we conclude the evidence supports the district court's conclusion Mrs. Hudspeth's consent was voluntary and not coerced.

Even though Mrs. Hudspeth's consent was voluntary and not coerced, the consent to the seizure of the home computer was not valid because her consent cannot "overrule" Mr. Hudspeth's denial of consent. Our holding here flows from the Supreme Court's jurisprudence regarding co-tenants' ability to consent to searches, as seen in United States v. Matlock, 415 U.S. 164 (1974), and most recently in Georgia v. Randolph, 126 S.Ct. 1515 (2006). The Supreme Court held in Matlock, "the consent of one who possesses common authority over premises or effects is valid against the absent, non-consenting person with whom that authority is shared." Id. at 170. In that case, officers arrested Matlock in the yard of his residence, detained him in a squad car nearby, and then obtained permission to search the house from one of Matlock's co-tenants. Id. at 166. The officers in Matlock did not ask Matlock whether he would consent to a search. Id.

In Georgia v. Randolph, 126 S.Ct. 1515 (2006), the Court asked "whether . . . an evidentiary seizure is . . . lawful with the permission of one occupant when the other, who later seeks to suppress the evidence, is present at the scene and expressly refuses to consent." Id. at 1518-19. In Randolph, the police asked the defendant for permission to search his house after his estranged wife told officers that there were "items of drug evidence" in the house. Id. at 1519. The defendant unequivocally refused. The police then turned to his wife for consent. She consented to the search. Id. The Court held that the seizure was not lawful. Id. at 1526 ("We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of

-11-

consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident.").

In so doing, the Court distinguished Randolph from Matlock based on the fact that in Randolph the defendant expressly denied consent to search, whereas in Matlock the defendant was silent. The Court stated: "In sum, there is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another, whether the issue is the color of the curtains or invitations to outsiders." Id. at 1523. In fact, the Court expressly stated that "[d]isputed permission is . . . no match for this central value of the Fourth Amendment, and the State's other countervailing claims do not add up to outweigh it." Id. at 1524.

Georgia v. Randolph does not directly address the situation present in this case, in which a co-tenant is not physically present at the search but expressly denied consent to search prior to the police seeking permission from the consenting co-tenant who is present on the property. Nevertheless, the same constitutional principles underlying the Supreme Court's concerns in Randolph apply regardless of whether the non-consenting co-tenant is physically present at the residence, outside the residence in a car, or, as in our case, off-site at his place of employment. Unlike in Matlock or in the hypothetical situation discussed in Randolph in which a "potential objector, nearby but not invited to take part in the threshold colloquy, loses out," here Hudspeth was invited to participate and expressly denied his consent to search. Id. at 1527. Thus, Mrs. Hudspeth's "disputed invitation, without more, [gave the] police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." Id. at 1523.

Further, both the majority and the dissent in Randolph state that there may be serious danger to the consenting spouse if police cannot enter to protect the non-consenting spouse during a domestic dispute where both spouses are present when the officers arrive. Id. at 1525-26, 1537-38. This argument would normally not be a concern when the non-consenting spouse is not physically present. Consequently, to

some degree, the case for respecting the denial of consent by a non-present occupant is stronger than the refusal of the physically-present occupant.

We believe that the Supreme Court has made it clear that the police must get a warrant when one co-occupant denies consent to search. In this case, that would not have been a significant burden. Therefore, we conclude that Mrs. Hudspeth's consent does not overrule Hudspeth's denial.

We invited the parties to file supplemental briefs after the Supreme Court issued its decision in Randolph. In its supplemental brief, the government argues Randolph does not apply, but if it does there are alternative grounds for the admission of the photos stored on the home computer, including inevitable discovery. Since those issues and the factual predicate were not developed in the district court we remand for further proceedings on the seizure of the home computer. We express no opinion as to whether there are any alternative grounds, other than Mrs. Hudspeth's consent, for admission of the photos.

B.    Sentencing

Normally if we were to reverse on a suppression issue, we would not discuss sentencing issues since the defendant typically would be expected to withdraw from the plea agreement and the conviction would be vacated. If the defendant were then re-convicted on the same or different charge, the district court would have to re-sentence the defendant with the possibility of a different plea agreement or different Guideline computations. In this case, we are in a somewhat unusual posture. This is a conditional guilty plea and it is still the defendant's prerogative as to whether he wants to withdraw from the plea agreement and withdraw his guilty plea. Given the fact that we have denied the suppression motion as to the office computer, it is not necessarily clear to us that the defendant will exercise that option. Accordingly, we proceed to decide the issues raised concerning the sentencing on the basis of the

current conditional plea agreement, recognizing that the defendant may ultimately withdraw from the agreement.

Hudspeth argues the district court erred in its application of the Guidelines to enhance his sentence. The government counters Hudspeth waived his right to appeal any sentencing errors with the exception of a sentence that exceeds the statutory maximum. The government further asserts, the waiver notwithstanding, the district court correctly applied the Guidelines and increased Hudspeth's offense level.

We review de novo the interpretation and enforcement of a plea agreement. United States v. Egenberger, 424 F.3d 803, 804 (8th Cir. 2005). Generally, "'a defendant is allowed to waive appellate rights,' including those involving the sentence imposed." United States v. Aronja-Inda, 422 F.3d 734, 737 (8th Cir. 2005) (quoting United States v. Andis, 333 F.3d 886, 889 (8th Cir. 2003) (en banc)). When we review a purported waiver of appellate rights, "we must confirm that the appeal falls within the scope of the waiver and that both the waiver and plea agreement were entered into knowingly and voluntarily." Andis, 333 F.3d at 889-90. These conditions notwithstanding, "we will not enforce a waiver where to do so would result in a miscarriage of justice." Id. at 890. The burden of proof rests with the government to show "that a plea agreement clearly and unambiguously waives a defendant's right to appeal." Id.

The government met this burden. At the change of plea hearing, Hudspeth acknowledged signing and understanding the terms of the plea agreement. Hudspeth said he understood the court would refer to the Guidelines in formulating a reasonable sentence, but that ultimately, the sentence imposed would be up to the district court. Hudspeth admitted the factual basis for his guilty plea, including facts used by the district court in applying the Guidelines enhancements. Finally, the district court recited the waiver of appellate rights contained in the signed plea agreement stating, "With respect to all other issues, however, you expressly waive your right to appeal your sentence directly or collaterally on any ground, except a sentence imposed in

-14-

excess of the statutory maximum or an illegal sentence." Hudspeth acknowledged understanding the waiver.

Based on the signed plea agreement and the change of plea colloquy, we conclude Hudspeth knowingly and voluntarily waived his appellate rights. See Aronja-Inda, 422 F.3d at 738. A challenge to the application of the Guidelines "is not subject to appeal in the face of a valid appeal waiver." Andis, 333 F.3d at 892. Hudspeth challenges his sentence on a ground which falls within the scope of his valid waiver of appellate rights. The sentence imposed did not exceed the statutory maximum and is not challenged as illegal. Accordingly, we do not reach those issues.

III.    CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Hudspeth's motion to suppress the evidence resulting from the search and seizure of the business computer, but reverse its judgment that there was a valid consent to the search and seizure of his home computer. Accordingly, we remand for further proceedings consist with this opinion.

RILEY, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority's conclusions regarding the lawful search and seizure of Hudspeth's business computer and its holding regarding Hudspeth's sentence. I also concur with the majority's conclusion Mrs. Hudspeth's consent was voluntary and not coerced. Although I agree with these well-reasoned and articulate portions of the majority's opinion, I disagree with the majority's conclusion Mrs. Hudspeth's consent is invalid under Georgia v. Randolph, 126 S. Ct. 1515 (2006).

First, the majority misreads Randolph. In Randolph, the Supreme Court "dealt directly with the reasonableness of police entry in reliance on consent by one occupant *subject to immediate challenge by another*" and held an authorized occupant's consent

to a warrantless search is invalid in the specific and limited instance where a "*physically present*" co-occupant objects. Id. at 1522, 1519 (emphasis added). In so holding, the Court distinguished Illinois v. Rodriguez, 497 U.S. 177 (1990), and United States v. Matlock, 415 U.S. 164 (1974). See Randolph, 126 S. Ct. at 1527-28. In Rodriguez, the Court held consent is sufficient if the person reasonably appears to have common authority over the premises. Rodriguez, 497 U.S. at 186. In Matlock, the Court held the consent of a co-occupant with common authority is valid against an *absent*, nonconsenting co-occupant. Matlock, 415 U.S. at 170. The Randolph Court distinguished Matlock solely upon the proximity of the objecting occupant at the time the co-occupant consents to the search. Randolph, 126 S. Ct. at 1527-28. The Court expressly did not overrule Matlock, reasoning, "Better to accept the formalism of distinguishing Matlock from this case than to impose a requirement, time-consuming in the field and in the courtroom, with no apparent systemic justification." Id. The Court concluded, "This [Randolph] case invites a straightforward application of the rule that a *physically present* inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant" and places no requirement on law enforcement officers to locate "a potentially objecting co-tenant before acting on the permission they had already received" from an authorized co-tenant. Id. (emphasis added).

Randolph does not apply to this case because Hudspeth was in custody and was not physically present at the home when Mrs. Hudspeth gave her consent. If the Supreme Court desired to adopt the broader rule espoused by the majority here, the Court would not have continuously used the phrase "physically present," and would have ruled police entry without a warrant is unreasonable whenever the suspect refuses consent to search his residence, regardless of where the suspect may be located at the time of his express refusal. This absentee's refusal of consent, therefore, would trump the consent of all other occupants to the premises.

Second, if, as the majority holds, Randolph applies "regardless of whether the non-consenting co-tenant is physically present at the residence, outside the residence

in a car, or, as in our case, off-site," supra at 12, Randolph necessarily overturned Matlock, which it expressly did not. In Matlock, the suspect "was not present with the opportunity to object, [but] he was in a squad car not far away." Randolph, 126 S. Ct. at 1527. In Rodriguez, the suspect "was actually asleep in the apartment, and the police might have roused him with a knock on the door." Id. The majority's interpretation makes the "physically present and objecting" language in Randolph mere surplusage.

Third, in addition to creating irreconcilable distinctions between Matlock and Randolph, the majority's holding raises public policy concerns by encouraging law enforcement to adopt a "don't ask" or an "ignorance is bliss" policy. Nothing in Randolph dictates, nor does the majority suggest, the officers were required to tell Mrs. Hudspeth her husband refused consent. Yet, under the majority's holding, Mrs. Hudspeth's consent would have been valid but for the officers' knowledge of Hudspeth's refusal. Thus, the majority's holding encourages law enforcement, in seeking consent, to bypass the suspect lest the suspect refuse consent, and instead seek only the consent of an authorized co-occupant, thereby avoiding the knowledge bar.

Hudspeth was not physically present and objecting when Mrs. Hudspeth gave her voluntary and non-coerced consent; therefore, Randolph does not apply. Nor does any other decision by the Supreme Court or this circuit apply and make Mrs. Hudspeth's consent invalid simply because the officers knew Hudspeth earlier had refused consent.

Thus, I dissent.

_____