*106 Justice Souter
delivered the opinion of the Court.
The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. Illinois v. Rodriguez, 497 U. S. 177 (1990); United States v. Matlock, 415 U. S. 164 (1974). The question here is whether such an evidentiary seizure is likewise lawful with the permission of one occupant when the other, who later seeks to suppress the evidence, is present at the scene and expressly refuses to consent. We hold that, in the circumstances here at issue, a physically present co-occupant’s stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him.
I
Respondent Scott Randolph and his wife, Janet, separated in late May 2001, when she left the marital residence in Americus, Georgia, and went to stay with her parents in Canada, taking their son and some belongings. In July, she returned to the Americus house with the child, though the record does not reveal whether her object was reconciliation or retrieval of remaining possessions.
*107 On the morning of July 6, she complained to the police that after a domestic dispute her husband took their son away, and when officers reached the house she told them that her husband was a cocaine user whose habit had caused financial troubles. She mentioned the marital problems, and said that she and their son had only recently returned after a stay of several weeks with her parents. Shortly after the police arrived, Scott Randolph returned and explained that he had removed the child to a neighbor’s house out of concern that his wife might take the boy out of the country again; he denied cocaine use, and countered that it was in fact his wife who abused drugs and alcohol.
One of the officers, Sergeant Murray, went with Janet Randolph to reclaim the child, and when they returned she not only renewed her complaints about her husband’s drug use, but also volunteered that there were “‘items of drug evidence’ ” in the house. Brief for Petitioner 3. Sergeant Murray asked Scott Randolph for permission to search the house, which he unequivocally refused.
The sergeant turned to Janet Randolph for consent to search, which she readily gave. She led the officer upstairs to a bedroom that she identified as Scott’s, where the sergeant noticed a section of a drinking straw with a powdery residue he suspected was cocaine. He then left the house to get an evidence bag from his car and to call the district attorney’s office, which instructed him to stop the search and apply for a warrant. When Sergeant Murray returned to the house, Janet Randolph withdrew her consent. The police took the straw to the police station, along with the Randolphs. After getting a search warrant, they returned to the house and seized further evidence of drug use, on the basis of which Scott Randolph was indicted for possession of cocaine.
He moved to suppress the evidence, as products of a warrantless search of his house unauthorized by his wife’s consent over his express refusal. The trial court denied the *108 motion, ruling that Janet Randolph had common authority to consent to the search.
The Court of Appeals of Georgia reversed, 264 Ga. App. 396, 590 S. E. 2d 834 (2003), and was itself sustained by the State Supreme Court, principally on the ground that “the consent to conduct a warrantless search of a residence given by one occupant is not valid in the face of the refusal of another occupant who is physically present at the scene to permit a warrantless search,” 278 Ga. 614, 604 S. E. 2d 835, 836 (2004). The Supreme Court of Georgia acknowledged this Court’s holding in Matlock, 415 U. S. 164, that “the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared,” id., at 170, and found Matlock distinguishable just because Scott Randolph was not “absent” from the colloquy on which the police relied for consent to make the search. The State Supreme Court stressed that the officers in Matlock had not been “faced with the physical presence of joint occupants, with one consenting to the search and the other objecting.” 278 Ga., at 615, 604 S. E. 2d, at 837. It held that an individual who chooses to live with another assumes a risk no greater than “ 'an inability to control access to the premises during [his] absence,’” ibid, (quoting 3 W. LaFave, Search and Seizure § 8.3(d), p. 731 (3d ed. 1996) (hereinafter LaFave)), and does not contemplate that his objection to a request to search commonly shared premises, if made, will be overlooked.
We granted certiorari to resolve a split of authority on whether one occupant may give law enforcement effective consent to search shared premises, as against a co-tenant who is present and states a refusal to permit the search.[1] 544 U. S. 973 (2005). We now affirm.
*109 II
To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person’s house as unreasonable per se, Payton v. New York, 445 U. S. 573, 586 (1980); Coolidge v. New Hampshire, 403 U. S. 443, 454-455 (1971), one “jealously and carefully drawn” exception, Jones v. United States, 357 U. S. 493, 499 (1958), recognizes the validity of searches with the voluntary consent of an individual possessing authority, Rodriguez, 497 U. S., at 181. That person might be the householder against whom evidence is sought, Schneckloth v. Bustamonte, 412 U. S. 218, 222 (1973), or a fellow occupant who shares common authority over property, when the suspect is absent, Matlock, supra, at 170, and the exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant, Rodriguez, supra, at 186. None of our co-occupant consent-to-search cases, however, has presented the further fact of a second occupant physically present and refusing permission to search, and later moving to suppress evidence so obtained.[2] The significance of such a refusal turns on the underpinnings of the co-occupant consent rule, as recognized since Matlock.
A
The defendant in that case was arrested in the yard of a house where he lived with a Mrs. Graff and several of her *110 relatives, and was detained in a squad ear parked nearby. When the police went to the door, Mrs. Graff admitted them and consented to a search of the house. 415 U. S., at 166. In resolving the defendant’s objection to use of the evidence taken in the warrantless search, we said that “the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.” Id., at 170. Consistent with our prior understanding that Fourth Amendment rights are not limited by the law of property, cf. Katz v. United States, 389 U. S. 347, 352-353 (1967), we explained that the third party’s “common authority” is not synonymous with a technical property interest:
“The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.” 415 U. S., at 171, n. 7 (citations omitted).
See also Frazier v. Cupp, 394 U. S. 731, 740 (1969) (“[I]n allowing [his cousin to share use of a duffel bag] and in leaving it in his house, [the suspect] must be taken to have assumed the risk that [the cousin] would allow someone else to look inside”). The common authority that counts under the Fourth Amendment may thus be broader than the rights accorded by property law, see Rodriguez, supra, at 181-182 (consent is sufficient when given by a person who reasonably appears to have common authority but who, in fact, has no property interest in the premises searched), although its limits, too, reflect specialized tenancy arrangements apparent to the police, see Chapman v. United States, 365 U. S. *111 610 (1961) (landlord could not consent to search of tenant’s home).
The constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules. Cf. Rakas v. Illinois, 439 U. S. 128, 144, n. 12 (1978) (an expectation of privacy is reasonable if it has “a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society”). Matlock accordingly not only holds that a solitary co-inhabitant may sometimes consent to a search of shared premises, but stands for the proposition that the reasonableness of such a search is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other’s interests.
B
Matlock’s example of common understanding is readily apparent. When someone comes to the door of a domestic dwelling with a baby at her hip, as Mrs. Graff did, she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other visitor that if she occupies the place along with others, she probably lives there subject to the assumption tenants usually make about their common authority when they share quarters. They understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another. As Matlock put it, shared tenancy is understood to include an “assumption of risk,” on which police officers are entitled to rely, and although some group living together might make an exceptional arrangement that no one could admit a guest without the agreement of all, the chance of such an eccentric scheme is too remote to expect visitors to investigate a particular *112 household’s rules before accepting an invitation to come in. So, Matlock relied on what was usual and placed no burden on the police to eliminate the possibility of atypical arrangements, in the absence of reason to doubt that the regular scheme was in place.
It is also easy to imagine different facts on which, if known, no common authority could sensibly be suspected. A person on the scene who identifies himself, say, as a landlord or a hotel manager calls up no customary understanding of authority to admit guests without the consent of the current occupant. See Chapman v. United States, supra (landlord); Stoner v. California, 376 U. S. 483 (1964) (hotel manager). A tenant in the ordinary course does not take rented premises subject to any formal or informal agreement that the landlord may let visitors into the dwelling, Chapman, supra, at 617, and a hotel guest customarily has no reason to expect the manager to allow anyone but his own employees into his room, see Stoner, supra, at 489; see also United States v. Jeffers, 342 U. S. 48, 51 (1951) (hotel staff had access to room for purposes of cleaning and maintenance, but no authority to admit police). In these circumstances, neither state-law property rights, nor common contractual arrangements, nor any other source points to a common understanding of authority to admit third parties generally without the consent of a person occupying the premises. And when it comes to searching through bureau drawers, there will be instances in which even a person clearly belonging on premises as an occupant may lack any perceived authority to consent; “a child of eight might well be considered to have the power to consent to the police crossing the threshold into that part of the house where any caller, such as a pollster or salesman, might well be admitted,” 4 LaFave § 8.4(c), at 207 (4th ed. 2004), but no one would reasonably expect such a child to be in a position to authorize anyone to rummage through his parents’ bedroom.
*113 c
Although we have not dealt directly with the reasonableness of police entry in reliance on consent by one occupant subject to immediate challenge by another, we took a step toward the issue in an earlier case dealing with the Fourth Amendment rights of a social guest arrested at premises the police entered without a warrant or the benefit of any exception to the warrant requirement. Minnesota v. Olson, 495 U. S. 91 (1990), held that overnight houseguests have a legitimate expectation of privacy in their temporary quarters because “it is unlikely that [the host] will admit someone who wants to see or meet with the guest over the objection of the guest,” id., at 99. If that customary expectation of courtesy or deference is a foundation of Fourth Amendment rights of a houseguest, it presumably should follow that an inhabitant of shared premises may claim at least as much, and it turns out that the co-inhabitant naturally has an even stronger claim.
To begin with, it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant’s invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, “stay out.” Without some very good reason, no sensible person would go inside under those conditions. Fear for the safety of the occupant issuing the invitation, or of someone else inside, would be thought to justify entry, but the justification then would be the personal risk, the threats to life or limb, not the disputed invitation.[3]
The visitor’s reticence without some such good reason would show not timidity but a realization that when people living together disagree over the use of their common quar *114 ters, a resolution must come through voluntary accommodation , not by appeals to authority. Unless the people living together fall within some recognized hierarchy, like a household of parent and child or barracks housing military personnel of different grades, there is no societal understanding of superior and inferior, a fact reflected in a standard formulation of domestic property law, that “[e]ach cotenant . . . has the right to use and enjoy the entire property as if he or she were the sole owner, limited only by the same right in the other cotenants.” 7 R. Powell, Powell on Real Property § 50.03[1], p. 50-14 (M. Wolf gen. ed. 2005). The want of any recognized superior authority among disagreeing tenants is also reflected in the law’s response when the disagreements cannot be resolved. The law does not ask who has the better side of the conflict; it simply provides a right to any co-tenant, even the most unreasonable, to obtain a decree partitioning the property (when the relationship is one of co-ownership) and terminating the relationship. See, e. g., 2 H. Tiffany, Real Property §§468, 473, 474, pp. 297, 307-309 (3d ed. 1939 and 2006 Cum. Supp.). And while a decree of partition is not the answer to disagreement among rental tenants, this situation resembles co-ownership in lacking the benefit of any understanding that one or the other rental co-tenant has a superior claim to control the use of the quarters they occupy together. In sum, there is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another, whether the issue is the color of the curtains or invitations to outsiders.
D
Since the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all. Accordingly, in the bal *115 ancing of competing individual and governmental interests entailed by the bar to unreasonable searches, Camara v. Municipal Court of City and County of San Francisco, 387 U. S. 523, 536-537 (1967), the cooperative occupant’s invitation adds nothing to the government’s side to counter the force of an objecting individual’s claim to security against the government’s intrusion into his dwelling place. Since we hold to the “centuries-old principle of respect for the privacy of the home,” Wilson v. Layne, 526 U. S. 603, 610 (1999), “it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people,” Minnesota v. Carter, 525 U. S. 83, 99 (1998) (Kennedy, J., concurring). We have, after all, lived our whole national history with an understanding of “the ancient adage that a man’s house is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown,” Miller v. United States, 357 U. S. 301, 307 (1958) (internal quotation marks omitted).[4]
Disputed permission is thus no match for this central value of the Fourth Amendment, and the State’s other countervailing claims do not add up to outweigh it.[5] Yes, we recognize the consenting tenant’s interest as a citizen in bringing crim *116 inal activity to light, see Coolidge, 403 U. S., at 488 (“[I]t is no part of the policy underlying the Fourth :.. Amendment] to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals”). And we understand a co-tenant’s legitimate self-interest in siding with the police to deflect suspicion raised by sharing quarters with a criminal, see 4 LaFave § 8.3(d), at 162, n. 72 (“The risk of being convicted of possession of drugs one knows are present and has tried to get the other occupant to remove is by no means insignificant”); cf. Schneckloth, 412 U. S., at 243 (evidence obtained pursuant to a consent search “may insure that a wholly innocent person is not wrongly charged with a criminal offense”).
But society can often have the benefit of these interests without relying on a theory of consent that ignores an inhabitant’s refusal to allow a warrantless search. The co-tenant acting on his own initiative may be able to deliver evidence to the police, Coolidge, supra, at 487-489 (suspect’s wife retrieved his guns from the couple’s house and turned them over to the police), and can tell the police what he knows, for use before a magistrate in getting a warrant.[6] The reliance *117 on a co-tenant’s information instead of disputed consent accords with the law’s general partiality toward “police action taken under a warrant [as against] searches and seizures without one,” United States v. Ventresca, 380 U. S. 102, 107 (1965); “the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers,” United States v. Lefkowitz, 285 U. S. 452, 464 (1932).
Nor should this established policy of Fourth Amendment law be undermined by the principal dissent’s claim that it shields spousal abusers and other violent co-tenants who will refuse to allow the police to enter a dwelling when their victims ask the police for help, post, at 138 (opinion of RobEETS, C. J.) (hereinafter the dissent). It is not that the dissent exaggerates violence in the home; we recognize that domestic abuse is a serious problem in the United States. See U. S. Dept, of Justice, National Institute of Justice, P. Tjaden & N. Thoennes, Full Report of the Prevalence, Incidence, and Consequences of Violence Against Women 25-26 (2000) (noting that over 20 million women and 6 million men will, in the course of their lifetimes, be the victims of intimate-partner abuse); U. S. Dept, of Health and Human Services, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Costs of Intimate Partner Violence Against Women in the United States 19 (2003) (finding that nearly 5.3 million intimate-partner victimizations, which result in close to 2 million injuries and 1,300 deaths, occur among women in the United States each year); U. S. Dept, of Justice, Bureau of Justice Statistics, Crime Data Brief, C. Rennison, Intimate Partner Violence, 1993-2001 (Feb. 2003) (noting that in 2001 intimate-partner violence made up 20% of violent crime against women); see also Becker, The Politics of Women’s *118 Wrongs and the Bill of “Rights”: A Bicentennial Perspective, 59 U. Chi. L. Rev. 453, 507-508 (1992) (noting that women may feel physical insecurity in their homes as a result of abuse from domestic partners).
But this case has no bearing on the capacity of the police to protect domestic victims. The dissent’s argument rests on the failure to distinguish two different issues: when the police may enter without committing a trespass, and when the police may enter to search for evidence. No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected. (And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause, see Texas v. Brown, 460 U. S. 730, 737-739 (1983) (plurality opinion).) Thus, the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes. See 4 LaFave § 8.3(d), at 161 (“[E]ven when . . . two persons quite clearly have equal rights in the place, as where two individuals are sharing an apartment on an equal basis, there may nonetheless sometimes exist a basis for giving greater recognition to the interests of one over the other.... [W]here the defendant has victimized the third-party ... the emergency nature of the situation is such that the third-party consent should validate a warrantless search despite defendant’s objections” (internal quotation marks omitted; third omission in original)). The undoubted right of the po *119 lice to enter in order to protect a victim, however, has nothing to do with the question in this case, whether a search with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent.[7]
None of the cases cited by the dissent support its improbable view that recognizing limits on merely evidentiary searches would compromise the capacity to protect a fearful occupant. In the circumstances of those cases, there is no danger that the fearful occupant will be kept behind the closed door of the house simply because the abusive tenant refuses to consent to a search. See United States v. Donlin, 982 F. 2d 31, 32 (CA1 1992) (victimized individual was already outside of her apartment when police arrived and, for all intents and purposes, within the protective custody of law enforcement officers); United States v. Hendrix, 595 F. 2d 883, 885-886 (CADC 1979) (per curiam) (even if the consent of the threatened co-occupant did not justify a warrantless search, the police entry was nevertheless allowable on exigent circumstances grounds); People v. Sanders, 904 P. 2d 1311, 1313-1315 (Colo. 1995) (en banc) (victimized individual gave her consent to search away from her home and was not present at the time of the police visit; alternatively, exigent circumstances existed to satisfy the warrantless exception); Brandon v. State, 778 P. 2d 221, 223-224 (Alaska App. 1989) (victimized individual consented away from her home and was not present at the time of the police visit); United States v. Davis, 290 F. 3d 1239, 1241 (CA10 2002) (immediate harm extinguished after husband “order[ed]” wife out of the home).
*120 The dissent’s red herring aside, we know, of course, that alternatives to disputed consent will not always open the door to search for evidence that the police suspect is inside. The consenting tenant may simply not disclose enough information, or information factual enough, to add up to a showing of probable cause, and there may be no exigency to justify fast action. But nothing in social custom or its reflection in private law argues for placing a higher value on delving into private premises to search for evidence in the face of disputed consent, than on requiring clear justification before the government searches private living quarters over a resident’s objection. We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident.[8]
E
There are two loose ends, the first being the explanation given in Matlock for the constitutional sufficiency of a co-tenant’s consent to enter and search: it “rests ... on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right... .” 415 U. S., at 171, n. 7. If Matlock’s co-tenant is giving permission “in his own right,” how can his “own right” be eliminated by another tenant’s objection? The answer appears in the very footnote from which the quoted statement is taken: the “right” to admit the police to which Matlock refers is not an enduring and enforceable ownership right as understood by the *121 private law of property, but is instead the authority recognized by customary social usage as having a substantial bearing on Fourth Amendment reasonableness in specific circumstances. Thus, to ask whether the consenting tenant has the right to admit the police when a physically present fellow tenant objects is not to question whether some property right may be divested by the mere objection of another. It is, rather, the question whether customary social understanding accords the consenting tenant authority powerful enough to prevail over the co-tenant’s objection. The Matlock Court did not purport to answer this question, a point made clear by another statement (which the dissent does not quote): the Court described the co-tenant’s consent as good against “the absent, nonconsenting” resident. Id., at 170.
The second loose end is the significance of Matlock and Rodriguez after today’s decision. Although the Matlock defendant was not present with the opportunity to object, he was in a squad car not far away; the Rodriguez defendant was actually asleep in the apartment, and the police might have roused him with a knock on the door before they entered with only the consent of an apparent co-tenant. If those cases are not to be undercut by today’s holding, we have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant’s permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.
This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant’s permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant’s contrary indication when he *122 expresses it. For the very reason that Rodriguez held it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent, we think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received. There is no ready reason to believe that efforts to invite a refusal would make a difference in many cases, whereas every co-tenant consent case would turn into a test about the adequacy of the police’s efforts to consult with a potential objector. Better to accept the formalism of distinguishing Matlock from this case than to impose a requirement, time consuming in the field and in the courtroom, with no apparent systemic justification. The pragmatic decision to accept the simplicity of this line is, moreover, supported by the substantial number of instances in which suspects who are asked for permission to search actually consent,[9] albeit imprudently, a fact that undercuts any argument that the police should try to locate a suspected inhabitant because his denial of consent would be a foregone conclusion.
Ill
This case invites a straightforward application of the rule that a physically present inhabitant’s express refusal of consent to a police search is dispositive as to him, regardless of *123 the consent of a fellow occupant. Scott Randolph’s refusal is clear, and nothing in the record justifies the search on grounds independent of Janet Randolph’s consent. The State does not argue that she gave any indication to the police of a need for protection inside the house that might have justified entry into the portion of the premises where the police found the powdery straw (which, if lawfully seized, could have been used when attempting to establish probable cause for the warrant issued later). Nor does the State claim that the entry and search should be upheld under the rubric of exigent circumstances, owing to some apprehension by the police officers that Scott Randolph would destroy evidence of drug use before any warrant could be obtained.
The judgment of the Supreme Court of Georgia is therefore affirmed.

It is so ordered.

Justice Alito took no part in the consideration or decision of this case.

 All four Courts of Appeals to have considered this question have concluded that consent remains effective in the face of an express objection. See United States v. Morning, 64 F. 3d 531, 533-536 (CA9 1995); United States v. Donlin, 982 F. 2d 31, 33 (CA1 1992); United States v. Hendrix, *109 595 F. 2d 883, 885 (CADC 1979) (per curiam); United States v. Sumlin, 567 F. 2d 684, 687-688 (CA6 1977). Of the state courts that have addressed the question, the majority have reached that conclusion as well. See, e. g., Love v. State, 355 Ark. 334, 342, 138 S. W. 3d 676, 680 (2003); Laramie v. Hysong, 808 P. 2d 199, 203-205 (Wyo. 1991); but cf. State v. Leach, 113 Wash. 2d 735, 744, 782 P. 2d 1035, 1040 (1989) (en bane) (requiring consent of all present co-occupants).

 Mindful of the multiplicity of living arrangements, we vary the terms used to describe residential co-occupancies. In so doing we do not mean, however, to suggest that the rule to be applied to them is similarly varied.

 Cf. Mincey v. Arizona, 437 U. S. 385, 393 (1978) (acknowledging the right of police to respond to emergency situations “threatening life or limb” and indicating that police may conduct a warrantless search provided that the search is “ ‘strictly circumscribed by the exigencies which justify its initiation’ ”).

 In the principal dissent’s view, the centuries of special protection for the privacy of the home are over. The dissent equates inviting the police into a co-tenant’s home over his contemporaneous objection with reporting a secret, post, at 142 (opinion of Roberts, C. J.), and the emphasis it places on the false equation suggests a deliberate intent to devalue the importance of the privacy of a dwelling place. The same attitude that privacy of a dwelling is not special underlies the dissent’s easy assumption that privacy shared with another individual is privacy waived for all purposes including warrantless searches by the police. Post, at 131.

 A generalized interest in expedient law enforcement cannot, without more, justify a warrantless search. See Mincey, supra, at 393 (“[T]he privacy of a person’s home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law”); Coolidge v. New Hampshire, 403 U. S. 443, 481 (1971) (“The warrant requirement... is not an inconvenience to be somehow ‘weighed’ against the claims of police efficiency”).

 Sometimes, of course, the very exchange of information like this in front of the objecting inhabitant may render consent irrelevant by creating an exigency that justifies immediate action on the police’s part; if the objecting tenant cannot be incapacitated from destroying easily disposable evidence during the time required to get a warrant, see Illinois v. McArthur, 531 U. S. 326, 331-332 (2001) (denying suspect access to his trailer home while police applied for a search warrant), a fairly perceived need to act on the spot to preserve evidence may justify entry and search under the exigent circumstances exception to the warrant requirement, cf. Schmerber v. California, 384 U. S. 757, 770-771 (1966) (warrant-less search permitted when “the delay necessary to obtain a warrant . . . threatened the destruction of evidence” (internal quotation marks omitted)).
Additional exigent circumstances might justify warrantless searches. See, e. g., Warden, Md. Penitentiary v. Hayden, 387 U. S. 294, 298 (1967) (hot pursuit); Chimel v. California, 395 U. S. 752 (1969) (protecting the safety of the police officers); Michigan v. Tyler, 436 U. S. 499 (1978) (immi *117 nent destruction to building); Johnson v. United States, 333 U. S. 10, 15 (1948) (likelihood that suspect will imminently flee).

 We understand the possibility that a battered individual will be afraid to express fear candidly, but this does not seem to be a reason to think such a person would invite the police into the dwelling to search for evidence against another. Hence, if a rule crediting consent over denial of consent were built on hoping to protect household victims, it would distort the Fourth Amendment with little, if any, constructive effect on domestic abuse investigations.

 The dissent is critical that our holding does not pass upon the constitutionality of such a search as to a third tenant against whom the government wishes to use evidence seized after a search with consent of one co-tenant subject to the contemporaneous objection of another, post, at 137. We decide the case before us, not a different one.

 See 4 LaFave §8.1, at 4 (“The so-called consent search is frequently relied upon by police as a means of investigating suspected criminal conduct” (footnote omitted)); Strauss, Reconstructing Consent, 92 J. Crim. L. & C. 211, 214 (2001-2002) (“Although precise figures detailing the number of searches conducted pursuant to consent are not — and probably can never be — available, there is no dispute that these type of searches affect tens of thousands, if not hundreds of thousands, of people every year” (footnote omitted)).