OPINION
{¶ 1} Defendant-appellant Shawn Ball appeals his conviction and sentence for one count of possession of heroin (more than 10 grams, but less than 50 grams), in violation of R.C. § 2925.11(A), a felony of the second degree. On September 19, 2005, Ball was indicted for one count of possession of heroin (more than 10 grams, but less than 50), in violation of R.C. § *Page 2 2925.11(A), and one count of possession of cocaine (more than 5 grams, but less than 25), in violation of R.C. § 2925.11(A). Ball was arraigned on September 27, 2005, stood mute, and the trial court entered not guilty pleas on his behalf.
 {¶ 2} On October 5, 2005, Ball filed a motion to suppress. A hearing on said motion was held on May 11, 2006. At the close of the hearing, the trial court provided the parties with additional time to file post-hearing memoranda in furtherance of their respective positions. On June 19, 2006, the trial court issued a written decision overruling Ball's motion to suppress.
 {¶ 3} Pursuant to negotiations with the State, Ball entered a no contest plea to one count of possession of heroin (more than 10 grams, but less than 50) on August 22, 2006. On August 24, 2006, the trial court found Ball guilty and sentenced him to two (2) years imprisonment and suspended his driver's license for six (6) months. Ball posted an appellate bond of $10,000.00, and his sentence was stayed pending appeal. Ball filed a timely notice of appeal with this Court on September 22, 2006.
 I {¶ 4} At approximately 10:30 a.m. on September 12, 2005, Dayton Police Officer Chris Malson was dispatched to 3820 West Cornell Woods, Apartment C, after Mary West called the police requesting that her live-in boyfriend, appellant Ball, be removed from her apartment. Officer Malson testified that he was advised that West would be waiting for him in the parking lot in front of the building where the apartment was located.
 {¶ 5} Upon arriving at the scene, Officer Malson met with West in the parking lot and she informed him that Ball was inside her apartment, and he had drugs and a firearm in his *Page 3 
possession. She also informed Officer Malson that Ball had outstanding warrants out against him and that she was afraid for her life. Officer Malson testified that West told him that the apartment was in her name, but Ball had been living with her for the past six months.
 {¶ 6} Officer Malson, along with Officer Heiber who had also been dispatched to the complex, approached the unit[1] where Ball was located. Officer Malson and West went to the front door of the apartment, while Officer Heiber positioned himself at the back door so as to prevent Ball from escaping from that route. West unlocked the front door to the apartment with her key, and Officer Malson entered the unit with his firearm drawn and announced his presence. After hearing some movement in the rear of the apartment, Officer Malson yelled for Ball to come out and proceed into the living room. Ball entered the living room of the apartment after approximately twenty seconds wearing only a pair of boxer shorts.
 {¶ 7} Officer Malson handcuffed Ball and took him outside the front door of the apartment and directed him to sit on the stairs leading up to the third floor. Officer Malson testified that at this point Ball became verbally abusive towards West who was also standing outside the front door, asking her, "Why are you going to do me like this?". After addressing West, Ball then stood up and proceeded to walk up the stairs leading to the third floor of the apartment building. When Officer Malson attempted to stop him, Ball told Officer Malson, "Don't fucking touch me." Officer Malson testified that after this exchange, he grabbed Ball and took him to the ground. Officers Malson and Heiber then escorted Ball to a police cruiser *Page 4 
and placed him in the back of the vehicle. Once Ball was secured in the cruiser, the police officers confirmed that he had several active arrest warrants outstanding.
 {¶ 8} While Ball was transported to jail, Officer Malson returned to West's apartment to search for the alleged firearm and contraband. West led Officers Malson and Heiber and Sergeant Wolpert of the Dayton Police to the back bedroom where they discovered a pistol, a plastic bag of heroin capsules, and a plastic bag containing cocaine powder in between the mattress and box springs. The officers then secured West's consent to search the remainder of the apartment for any other weapons or contraband. A final search of the apartment yielded approximately $1,305.00 in cash, a scale, and a large chunk of heroin in block form. Officer Malson testified that West indicated that all of the illegal items belonged to Ball, and the confiscated money was proceeds from Ball's drug sales.
 {¶ 9} As previously noted, Ball ultimately pled no contest to one count of possession of heroin (more than 10 grams, but less than 50). The trial court found Ball guilty and sentenced him to two (2) years imprisonment and suspended his driver's license for six (6) months.
 {¶ 10} It is from this judgment that Ball now appeals.
 II {¶ 11} Ball's sole assignment of error is as follows:
 {¶ 12} "THE TRIAL COURT ERRED IN FINDING THAT THE POLICE WERE NOT REQUIRED TO GET THE CONSENT OF MR. BALL TO SEARCH THE PREMISES IN WHICH HE WAS A CO-TENANT AND THE COURT FURTHER ERRED IN FINDING THAT THE POLICE, HAVING ENTERED THE PREMISES, FORCIBLY RESTRAINING THE DEFENDANT, HANDCUFFING HIS HANDS BEHIND HIS BACK, THROWING HIM *Page 5 
TO THE GROUND AND TAKING HIM OUT TO THE POLICE CAR AND AWAY FROM THE SCENE WAS NOT CONDUCT WHICH OVERCAME AN AFFIRMATIVE DUTY ON THE DEFENDANT TO VOCALIZE AN OBJECTION TO THE POLICE SEARCH. ALL OF THE ABOVE BEING DONE WITHOUT HIS CONSENT AND WITHOUT A SEARCH WARRANT OBTAINED BY THE POLICE."
 {¶ 13} In his sole assignment, Ball contends that the trial court erred when it overruled his motion to suppress all of the physical evidence obtained at the apartment he shared with West. Ball argues that pursuant to the United States Supreme Court's holding in Georgia v.Randolph (2006), 547 U.S. 103, 126 S.Ct. 1515, the search of the apartment was invalid because the police failed to gain his consent before initiating the search. Further, Ball asserts that the police officers' actions in removing him from the apartment and placing him in their cruiser were calculated to deprive him of the right to object to the search of the apartment in which he had a possessory interest. We disagree.
 {¶ 14} With respect to a motion to suppress, "the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." State v.Hopfer (1996), 112 Ohio App.3d 521, 548, 679 N.E.2d 321, quoting Statev. Venham (1994), 96 Ohio App.3d 649, 653, 645 N.E.2d 831. The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. State v.Isaac (July 15, 2005), Montgomery App. No. 20662, 2005-Ohio-3733, citingState v. Retherford (1994), 93 Ohio App.3d 586, 639 N.E.2d 498. Accepting those facts as true, the appellate court must then independently determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. Id. In the *Page 6 
instant case, both parties agree that the central issue to be reviewed de novo is whether the officers' actions in removing Ball from the apartment were specifically calculated to deprive him of the right to object to the otherwise consensual search of the apartment in which he had a possessory interest in contravention of the Supreme Court's holding in Randolph, supra.
 {¶ 15} In Randolph, supra, the Supreme Court held that police lack the authority to conduct an evidentiary search of a residence based upon the consent of a co-occupant when the other physically present co-occupant unequivocally refuses to give consent. The majority also held that the subsequent search of a premises would be considered unlawful if evidence existed that established that the police removed a co-occupant from the premises in order to avoid his or her contemporaneous objection to the search.
 {¶ 16} Ball contends that his situation falls squarely under the holding in Randolph, supra, because his arrest and removal from the premises before he could object to the search was clearly effectuated by the police in order to deprive him of the right to object. As noted by the trial court in its decision overruling Ball's suppression motion, the U.S. Supreme Court addressed this very scenario inRandolph, supra, in which the Court stated the following:
 {¶ 17} "The second loose end is the significance of [United Statesv.] Matlock [(1974), 415 U.S. 164] and [Illinois v.] Rodriguez [(1990),497 U.S. 177] after today's decision. Although the Matlock defendant was not present with the opportunity to object, he was in a squad car not for away; the Rodriguez defendant was actually asleep in the apartment, and the police might have roused him with a knock on the door before they entered with only the consent of an apparent co-tenant. If those cases are not to be undercut by today's holding, we have to admit that we are drawing a fine line; if a potential defendant with self-interest in *Page 7 
objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.
 {¶ 18} "This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removedthe potentially objecting tenant from the entrance for the sake ofavoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it. For the very reason that Rodriguez held it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent, we think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially obj ecting co-tenant before acting on the permission they had already received. There is no ready reason to believe that efforts to invite a refusal would make a difference in many cases, whereas every co-tenant consent case would turn into a test about the adequacy of the police's efforts to consult with a potential obj ector. Better to accept the formalism of distinguishing Matlock from this case than to impose a requirement, time consuming in the field and in the courtroom, with no apparent systemic justification. The pragmatic decision to accept the simplicity of this line is, moreover, supported by the substantial number of instances in which suspects who are asked for permission to search actually consent, albeit imprudently, a fact that undercuts any argument that the police should try to locate a suspected inhabitant because his denial of consent would be *Page 8 
a foregone conclusion." Id. at 121-122.
 {¶ 19} In the instant case, there is no evidence in the record that Officers Malson and Heiber removed Ball from the apartment and placed him in the cruiser in order to avoid his possible objection to the subsequent search of the apartment. As the record indicates, Ball was in the process of being removed from the apartment because West believed that he posed a threat to her. Once Ball realized that he was being removed from the apartment, he became belligerent. In particular, Ball initiated a verbal confrontation with West and Officer Malson. Ball then refused to remain seated in the hallway of the apartment building pursuant to the instructions of Officer Malson. In light of Ball's defiant behavior, the officers had no choice but to secure him in the back of a police cruiser. After securing Ball in the back of the cruiser for his safety as well as the safety of the others present, Officer Malson was able to confirm that there were, in fact, several active outstanding warrants for Ball's arrest. Once this determination was made, Ball was arrested and transported to jail. Simply put, it was Ball's own conduct that resulted in his removal from the apartment, placed in the back of the cruiser, and ultimately arrested and jailed on the active warrants. Most importantly, Ball never objected to the search of the apartment while he was in the stairwell nor after he had been placed in the police cruiser.
 {¶ 20} Based on the record before us, we hold that the rule outlined in Randolph, supra, applies. Officers Malson and Heiber properly obtained consent to search the entire apartment from Mary West. Ball was not physically present at the time of the search nor did he unequivocally refuse to provide his consent. Thus, we agree with the trial court and find that under these circumstances, West's consent was sufficient to provide the officers with the authority to conduct a search of the apartment for weapons and contraband. *Page 9 
 III {¶ 21} Ball's sole assignment of error having been overruled, the judgment of the trial court is affirmed.
(Hon. Sumner E. Walters retired from the Third District Court of Appeals sitting by assignment of the Chief Justice of the Supreme Court of Ohio).
FAIN, J. and WALTERS, J., concur.
[1] The apartment building in question is composed of three stories with one apartment on each floor. West's apartment was located on the second floor of the building. There is a common door to the building, itself, and each unit has its own secured door. Each unit also has its own back door which opens to a small balcony attached to the rear of the unit. *Page 1