969 So.2d 463 (2007)
STATE of Florida, Appellant,
v.
Donald Lee CLAVETTE, Appellee.
No. 5D07-598.
District Court of Appeal of Florida, Fifth District.
November 16, 2007.
*464 Bill McCollum, Attorney General, Tallahassee, and Douglas T. Squire, Assistant Attorney General, Daytona Beach, for Appellant.
James S. Purdy, Public Defender, and Nancy Ryan, Assistant Public Defender, Daytona Beach, for Appellee.
ORFINGER, J.
Meghan Greene and her boyfriend, Donald L. Clavette, lived together in a home they shared with their one-month-old child. Following a disagreement, Ms. Greene left their residence with the child to stay with friends. A few hours later, a highly intoxicated Mr. Clavette forced his way into the home where Ms. Greene and the child were staying, pushed her down and tried to take the child. Unable to do so, Mr. Clavette departed. The Orange County Sheriff's Department was called and several deputies responded. After learning what happened and where Mr. Clavette and Ms. Greene lived, the deputies asked Ms. Greene for consent to search their residence in an effort to locate Mr. Clavette. Ms. Greene consented and the deputies departed in search of Mr. Clavette, intending to arrest him for misdemeanor domestic violence.
The deputies arrived at the residence shared by Mr. Clavette and Ms. Greene shortly thereafter, between 4:00 and 5:00 a.m. They attempted to contact anyone in the home by telephone and by illuminating the home with a spotlight. When those steps were unsuccessful, the deputies used their public address system in an effort to raise anyone in the residence, but again got no response. Finally, the deputies knocked on the front door and Mr. Clavette's sister opened the door. Initially, she told the deputies that she and her boyfriend were spending the night and that Mr. Clavette was not home. However, she later told the deputies that she was not certain whether Mr. Clavette was in the residence. The deputies took Mr. Clavette's sister and her boyfriend to a safe location outside, and entered the residence. They conducted a protective sweep of the house and found Mr. Clavette behind the closed door of his bedroom, lying in bed. After they identified themselves as deputy sheriffs, Mr. Clavette lunged toward one the deputies, grabbing the barrel of his rifle. A fight ensued, and Mr. Clavette was subdued and arrested by the deputies and subsequently charged by information with attempting to take a firearm from a law enforcement officer, resisting an officer with violence, battery on a law enforcement officer and misdemeanor domestic violence battery.
Through counsel, Mr. Clavette filed a motion to suppress pursuant to Florida Rule of Criminal Procedure 3.190(h). The motion did not attempt to suppress any physical evidence or statements made by Mr. Clavette. Instead, it sought to suppress "all testimonial evidence [from the *465 deputies] relating to the . . . charges" resulting from his arrest. Concluding that the deputies entered the residence illegally to make a warrantless arrest for a misdemeanor, the trial judge granted the motion and suppressed any testimony by the deputies regarding the fracas that ensued when they arrested Mr. Clavette. The State now appeals the suppression order. As explained below, we reverse.
On appeal of a suppression order, legal questions are reviewed de novo, while factual decisions made by the trial court, viewed in light of constitutionally-mandated burdens of proof, are entitled to deference if supported by competent substantial evidence. Williams v. State, 788 So.2d 334, 336 (Fla. 5th DCA 2001).
A private home is the area where a person enjoys the highest expectation of privacy under the Fourth Amendment. See Vasquez v. State, 870 So.2d 26, 29 (Fla. 2d DCA 2003). Consequently, the warrantless entry of a person's home by law enforcement officers to search for objects of a crime is generally barred by the Fourth Amendment, subject only to a few carefully drawn exceptions. Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (prohibiting warrantless entry into home to effect arrest; reiterating that physical entry of home is chief evil against which Fourth Amendment is directed). One such exception recognizes the validity of searches with the voluntary consent of an individual who possesses joint access, common authority, or other sufficient relationship over the premises being searched. United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). However, although joint occupants may consent to a search of their shared premises, when consent is expressly refused by the party against whom the search is directed, any subsequent consent by the other joint occupant is invalid. See Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006).
In the case before us, Mr. Clavette was a joint occupant of the home whose constitutional rights were clearly implicated by law enforcement's entry into the home that he shared with Ms. Greene. While not disputing Ms. Greene's right to consent to the entry, Mr. Clavette argues that his refusal to respond to law enforcement's entreaties constituted an express refusal on his part to allow the entry, thereby negating Ms. Green's consent. We disagree.
In Randolph, the Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 547 U.S. at 120, 126 S.Ct. 1515 (emphasis added). By holding that only the express refusal of consent is sufficient to overcome the consent given to the police by another resident, we conclude that the Supreme Court intended that such refusal be direct, firm and explicit, and not one gleaned by implication or inference.[1] Indeed, the Randolph opinion went on to posit an example that has significant implications here. The Court said that "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." Id. at 105, 126 S.Ct. 1515. The latter is precisely what occurred here.
*466 The Randolph dissent argued that the rule adopted by the majority was too narrow and advocated for a broader rule that would permit the police to enter a residence anytime an individual with joint authority over the premises consented, irrespective of an objection by other co-occupants. In describing what he perceived to be a flawed rule adopted by the majority, Chief Justice Roberts wrote:
The rule the majority fashions does not implement the high office of the Fourth Amendment to protect privacy, but instead provides protection on a random and happenstance basis, protecting, for example, a co-occupant who happens to be at the front door when the other occupant consents to a search, but not one napping or watching television in the next room.
Id. at 127, 126 S.Ct. 1515 (Roberts, C.J., dissenting).
In the case before us, Mr. Clavette never expressly refused consent. To the contrary, just as Randolph suggested, he was either hiding, resting or sleeping in his bedroom and did not hear or chose not to respond to the police prior to their entry into his home. In any event, under the rule adopted in Randolph, Mr. Clavette's lack of express refusal to the police entry was insufficient to overcome the consent given by Ms. Greene.
Another point merits discussion. Even if the police had illegally entered the residence, Mr. Clavette would not have been entitled to suppress the observations and testimony of the deputies regarding the events that occurred thereafter. This is because it is well-established that a person is not entitled to use force to resist even an illegal arrest. State v. Freeney, 613 So.2d 523, 525 (Fla. 2d DCA 1993). As Professor LaFave recognizes "[o]n occasion, when the police conduct an illegal arrest or an illegal search this will prompt the person arrested or subjected to the search [to] react by committing some criminal offense. He might attack the arresting or searching officer. . . . In such cases, the courts are confronted with the question of whether evidence of this new crime must be suppressed as a fruit of the prior illegal arrest or search." 4 Wayne R. LaFave, Search and Seizure, § 11.4(j) (4th ed. 2004). The courts have consistently held that the evidence of the new crime is admissible notwithstanding the prior illegal arrest or search.
Professor LaFave explains the rule adopted by the courts thusly:
In cases where the response has been a physical attack . . . courts have again held that the evidence of this new crime is admissible. Illustrative is Commonwealth v. Saia, [372 Mass. 53, 360 N.E.2d 329 (1977)] where an officer was attacked by two men after he had made an entry into their premises. Although the court was inclined to the view that the entry was lawful, it was held that the evidence of this assault would be admissible even if the officer had been engaged in an illegal search.
Even if one assumes the illegality of the entry there is no showing that the evidence sought to be suppressed is an "exploitation" of the primary illegality. . . . What is present here is simply an attempt to suppress evidence which is a result of allegedly willful acts of misconduct by [the defendants], whose provocation and perhaps ultimate defense may be found in the fact of the entry itself. The exclusionary rule does not reach this far. . . . Suppose a police officer or other person had been killed in the affray that allegedly occurred here. That hypothesis illustrates the inappropriateness of any ruling that the observations of the police were inadmissible *467 under the exclusionary rule in the circumstances of these cases.
In these cases as well, it is sometimes said by way of explanation that the attack upon the officer was a "free and independent action." But here . . . the better basis of distinction is that no exploitation of the prior illegality is involved and that the rationale of the exclusionary rule does not justify its extensions to this extreme. "Application of the exclusionary rule in such fashion," as one court put it, "would in effect give the victims of illegal searches a license to assault and murder the officers involveda result manifestly unacceptable."
(Footnotes and internal citations omitted).
This reasoning is sound, and we adopt it. Mr. Clavette's use of force was an independent act of misconduct. See generally Freeney, 613 So.2d at 525 (holding that evidence that defendant pushed officer backwards, ran away, and continued to struggle was not "legally derivative" of allegedly illegal stop, and thus was not required to be excluded under exclusionary rule); State v. Taylor, 557 So.2d 941 (Fla. 2d DCA 1990) (holding that driver's abusive and highly confrontational behavior, immediately after his vehicle had been stopped for traffic infraction, justified driver's arrest for disorderly conduct and subsequent search of his vehicle); LaFave, supra, § 11.4(a). Under the law, Mr. Clavette was expected to tolerate even an illegal entry and seek redress for any violation of his rights in a subsequent legal proceeding. Freeney, 613 So.2d at 525; see Fields v. State, 178 Ind.App. 350, 382 N.E.2d 972, 975 (1978) ("A citizen, today, can seek his remedy for a policeman's unwarranted and illegal intrusion into the citizen's private affairs by bringing a civil action in the courts against the police officer and the governmental unit which the officer represents. The common law right of forceful resistance to an unlawful arrest tends to promote violence and increases the chances of someone getting injured or killed.").
Having concluded that the deputies' entry into Mr. Clavette's home was not illegal, and even if it had been, Mr. Clavette was not authorized to respond with violence, we reverse the order of suppression and remand this matter for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MONACO and TORPY, JJ., concur.
NOTES
[1] The dictionary defines "express" as "directly, firmly and explicitly stated." See Webster's Ninth New College Dictionary 438 (9th ed. 1989).