STATE OF NORTH CAROLINA v. DWIGHT McDOUGALD

No. COA06-164-2

(Filed 19 August 2008)

**Search and Seizure— warrantless search of shared dwelling— express refusal of consent by physically present resident— motion to suppress evidence—error not harmless beyond reasonable doubt**

The trial court erred in a trafficking by possessing 100 or more but less than 500 dosage units of methylenedioxyamphetamine (MDA) and sale of Schedule I substance (MDA) case by denying defendant's motion to suppress evidence seized from his apartment when defendant refused consent but his wife agreed to allow the search to proceed, and defendant is entitled to a new trial, because: (1) a warrantless search of a shared dwelling for

evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident; and (2) although there was overwhelming evidence of a coparticipant's criminal activity, aside from the MDA and ecstasy found in defendant's apartment as a result of the illegal search, the evidence connecting defendant to the crimes for which he was convicted was far from overwhelming and thus failed to provide the threshold of evidence necessary to render the error harmless beyond a reasonable doubt.

Upon remand to the Court of Appeals by order of the North Carolina Supreme Court, filed 7 March 2008, remanding the decision of this Court in *State v. McDougald*, 181 N.C. App. 41, 638 S.E.2d 546 (2007). We are to determine if any error pursuant to *Georgia v. Randolph*, 547 U.S. 103, 164 L. Ed. 2d 208 (2006) was harmless beyond a reasonable doubt. *See State v. McDougald*, No. 64A07, 2008 N.C. LEXIS 136 (N.C. Mar. 7, 2008). Appeal by defendant from judgments entered 12 April 2005 by Judge Jerry Cash Martin in Guilford County Superior Court. Originally heard in the Court of Appeals on 19 October 2006.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General John P. Scherer, II, for the State.*

*Irving Joyner, for defendant-appellant.*

JACKSON, Judge.

This case is heard on remand from the Supreme Court. A detailed recitation of the facts may be found in the original opinion, *State v. McDougald*, 181 N.C. App. 41, 638 S.E.2d 546 (2007). For the convenience of the reader, a summary of the facts is set forth below.

Dwight McDougald ("defendant") and Kathryn Powell ("Powell") were arrested as the result of an undercover drug sale coordinated by Officer Aaron Griffiths ("Officer Griffiths") of the Greensboro Police Department. The jury found defendant guilty of conspiracy to traffick by possessing 100 or more but less than 500 dosage units of methylenedioxyamphetamine ("MDA") but was unable to reach a unanimous verdict on two remaining charges. Defendant subsequently entered guilty pleas to trafficking by possessing 100 or more but less than 500 dosage units of MDA and to sale of Schedule I substance, MDA. He was sentenced to a term of thirty-five to forty-two months imprison-

ment for the offenses of trafficking by possessing and conspiracy to traffick. For the offense of sale of a Schedule I substance, MDA, defendant received a suspended sentence of thirty-six months of supervised probation, which was ordered to begin at the expiration of his prison term.

Defendant appealed the denial of his motion to suppress evidence seized from his apartment. Although he refused to consent to the search, his wife agreed to allow the search to proceed. Defendant argued that proceeding with the search based upon only his wife's consent was a violation of *Georgia v. Randolph*, 547 U.S. 103, 164 L. Ed. 2d 208 (2006). In *Randolph*, the majority held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 120, 164 L. Ed. 2d at 226. This is the precise issue defendant presents for our review.

In our prior opinion, as to the conspiracy charge, we dismissed defendant's argument based upon violations of our Appellate Rules. Judge Elmore dissented, providing the basis for review by the North Carolina Supreme Court. The charges to which defendant pled guilty are not currently before this Court. The State essentially has conceded error pursuant to *Randolph* and we now review our decision to determine if any error was harmless beyond a reasonable doubt. We hold that it was not.

"Even if [a] party can show that the trial court erred in [an evidentiary] ruling, relief ordinarily will not be granted absent a showing of prejudice." *State v. Herring*, 322 N.C. 733, 749, 370 S.E.2d 363, 373 (1988) (citing N.C. Gen. Stat. § 15A-1443(a) (1983)). However, pursuant to North Carolina General Statutes, section 15A-1443(b), "[a] violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C. Gen. Stat. § 15A-1443(b) (2005). A constitutional error may be rendered harmless by presenting overwhelming evidence of defendant's guilt notwithstanding the challenged evidence. *State v. Autry*, 321 N.C. 392, 403, 364 S.E.2d 341, 348 (1988).

After carefully reviewing the trial testimony in this case, we agree with Judge Elmore's dissent to the Court's prior opinion. Although there was overwhelming evidence of Powell's criminal activity, aside

from the MDA and ecstasy found in defendant's apartment as a result of the illegal search, the evidence connecting defendant to the crime for which he was convicted was far from overwhelming, and as such failed to provide the threshold of evidence necessary to render the error harmless beyond a reasonable doubt.

At trial, Detective Duane James ("Detective James") testified that his role in the investigation was to act as the "flash person"—the undercover officer in charge of securing large sums of money and showing it to the supplier if required. Detective James observed Powell go to the car of Earl Jones ("Jones"), a confidential informant. Powell and Jones then stood outside of the car talking. Detective James observed defendant crossing the apartment complex towards Powell and continue around the building. He observed Powell leave and return a few minutes later, getting into Jones' car. Jones then got out of his car and pointed towards Detective James. Both Powell and Jones crossed to Detective James' car, and he rolled down his window to talk to them. Powell got into Detective James' car and informed him that the deal had changed from 1000 pills to 385. Detective James told Powell that she could count the money and go talk to whomever she needed; he and Powell counted out $3,500.00.

After counting the money, Powell left Detective James' car and she and Jones walked away. Powell went towards the apartments; Jones came back to Detective James. A few minutes later, Detective James observed Powell returning to his car. She got into his car, pulled out a bag and said there were 385 pills. After Detective James gave Powell the money, she got out of the car, and walked back towards the apartment. She then was arrested. Powell acted as an intermediary for the transaction.

Detective Clarence Wally Schoolfield ("Detective Schoolfield") testified that he observed Powell—whom he described as the contact—come down to the parking lot and otherwise corroborated Detective James' testimony. Upon searching defendant—who was detained in Powell's apartment—Detective Schoolfield found $398 in his front right pocket and defendant's wallet in the left rear pocket. Detective Schoolfield searched Powell's apartment and seized marijuana and drug paraphernalia. He also seized two guns, one of which was stolen.

Powell testified as part of a plea deal. She stated that she used to sell marijuana before she moved to the apartment complex where she was arrested and that Jones was her supplier. Jones called her and

asked her if she could get pills. She answered that she could. Because she had talked to defendant a few times about his selling pills, she contacted him. Defendant told her to let him know when she needed them. Powell testified that defendant changed the number of pills from the 500 that Jones had requested to 385.[1] Defendant told her that he would sell the pills to her for $8.50 each and that she could sell them for $9.00 each; she would make $180, which defendant paid before the sale.

Powell testified that defendant informed her that he would walk over to her apartment when the buyer arrived. She testified that after Jones and defendant had arrived at her apartment, she saw defendant laying pills out on her counter. Powell testified that she was fairly certain that she had told Jones where she was getting the pills. She also informed the police that she obtained the pills from defendant.

Officer Griffiths was the lead investigator in the case and testified that he had been investigating defendant since 2002, and had conducted surveillance of defendant's apartment for several months prior to the 7 July 2004 arrest. Officer Griffiths observed Powell come down and meet with Jones. He also observed defendant come down and apparently say something to Powell or Jones as he passed by them. He did not observe anything "on" defendant as he passed. Griffiths observed Powell bring down a bag under her clothes, go to James' car, put something down the front of her shorts, and try to run back to her apartment.

Officer Griffiths was monitoring Jones' body wire transmission and overheard Powell repeatedly request that the deal "go down" upstairs and state that "he" would give Jones the drugs. Over the wire, Officer Griffiths heard Powell refer to some other male as being part of the deal—for example: "he send me," "he's in my house," "he can count 'em," and "I don't think he wants to do it out here. He lives here." When defendant walked by, Powell said, "[T]here he is right there. He's got his son."

Upon her arrest, Powell said to Officer Griffiths that she was "just making money delivering something." When asked what, she replied, "You know. Pills. 'X.' " She informed the officer that defendant was in her apartment. After her arrest, Officer Griffiths took a statement from Powell, which read: "Somebody wanted 'X.' I knew where to get it from. Quick flip. Man gives me one price. I make two hundred to

---

1. It is unclear why police officers were expecting a sale of 1000 pills while Powell was expecting a sale of only 500 pills.

IN RE M.H.B.

[192 N.C. App. 258 (2008)]

walk from one destination to another." Officer Griffiths then asked her direct questions—what she was doing; how much she was selling; and for whom she was selling it. He was more interested in defendant as the main target; he considered Powell as just a middle person, a runner.

Powell informed Officer Griffiths that she was selling 300 to 400 pills for $3,000.00 for which she was to make $200.00. She was delivering them for 'D' who lived in her building. By 'D,' she meant defendant. Powell also informed Officer Griffiths that she thought it was 380 pills of Ecstasy. She counted the money and went back upstairs. She got the pills from 'D' and took them to a black male (Detective James). She said she was just trying to make $200 and that 'D' brought the pills over. As Officer Griffiths was filling out police paperwork at the Guilford County Jail, defendant approached him and said, "She was just going to make a little money for this. She don't know what she's doing or what's going on."

As we have determined that the above-referenced evidence against defendant was not overwhelming absent the MDA and ecstasy found in defendant's apartment as a result of the illegal search, this constitutional error was not harmless beyond a reasonable doubt. Therefore, defendant is entitled to a new trial.

New trial.

Chief Judge MARTIN and Judge ELMORE concur.