*308 OPINION OF THE COURT
Joseph Kevin McKay, J.
Introduction
Defendant has been indicted for criminal possession of a weapon in the third and fourth degrees, menacing in the second degree and harassment in the second degree. The case was referred to this court for a combined Mapp/Dunaway/Huntley hearing, which was held on September 14, 2007. The evidentiary record consists of the testimony of Police Officers Artale and Castronova and certain exhibits (memo book page of Castronova with consent to search, permission to search police form, a Miranda sheet and defendant’s written statement). Posthearing memoranda of law were submitted by both sides and oral argument was held on October 18, 2007.
Findings of Fact
I accept as substantially truthful and accurate the testimony of both police officers and find that the following facts were established on this record. On November 28, 2005, at approximately 11:30 a.m., Officers Artale and Castronova of the 83rd Precinct separately received a radio run of a man with a firearm directing them to 190 Schaefer Street in Brooklyn. Once they arrived there they met the complaining witness, Reuben Liverpool, the landlord of the building, who told them that he had an argument in the lobby with a resident living on the third floor, that the man had gone upstairs to his apartment and returned with a handgun, which he pointed at Mr. Liverpool, who then left the building and called 911. Officer Castronova and other police officers began walking up the stairs toward the third-floor apartment where the man lived, but were met on the second-floor landing by a man carrying a child, who was identified by Liverpool as the man who had menaced him with a gun and who was identified in court as defendant. He admitted to the officers that he had a dispute with Liverpool, but denied there was a gun. Castronova asked defendant if he could search his apartment, but defendant refused to give his consent. Defendant was arrested for menacing and Officer Ar-tale brought him back to the 83rd Precinct for booking.
While defendant was still present with police outside his apartment, a woman identified as the aunt of the child defendant was holding came down to the second-floor landing from the third floor and she was given the child. The aunt then *309 telephoned Brenda Nieves at work. Ms. Nieves lived with defendant and was identified as his wife. The aunt told Castronova that Ms. Nieves would be home soon and Castronova decided to wait outside Ms. Nieves’ and defendant’s apartment for her arrival.
After 20 to 25 minutes, Ms. Nieves arrived. Officer Castronova explained to her what had happened, and asked her permission to search their apartment for a gun. Without telling her that defendant had refused to consent, he did advise her that she had the right to refuse to allow the search. She consented, and signed a statement of consent in Castronova’s memo book. Ms. Nieves then let Castronova into the apartment with her key, but before the search began he waited for a more formal police “Permission to Search” form, which was delivered at his request from the precinct and signed by Ms. Nieves. The search then began and once it reached the bedroom Ms. Nieves told the police where to find the gun, and a loaded .38 caliber handgun was then recovered from behind a drawer in a nightstand next to the bed in the bedroom shared by Ms. Nieves and defendant. Officer Castronova unloaded the weapon, brought it back to the police station and vouchered it.
After Artale, who was processing the arrest at the precinct, was advised that the firearm was recovered, he notified a special unit called Trigger-Lock to come to the precinct to interview defendant. That was done by Detective Martinez, and witnessed by Artale. The Miranda rights were read to defendant, and he understood and freely waived his rights and signed a statement confessing to possession of the gun, which he asserted was for protection. The charges were elevated from misdemeanor menacing to felonious possession of a firearm.
Conclusions of Law
The critical issue in this case is whether, under Georgia v Randolph (547 US 103 [2006]), the police were entitled to rely on the consent given by defendant’s wife to search the apartment they share, in the face of defendant’s very recent refusal to consent. When both adults are present at the same time the Randolph case flatly holds that the police cannot reasonably rely on the one giving consent when the target of the investigation objects.
The distinction in Olmo is that defendant was not actually present when his wife gave her consent to search their apartment because he had already been taken to the precinct to begin *310 processing his lawful arrest. The question for this court is whether Olmo presents a necessary application of Randolph, requiring suppression, or rather would amount to an unwarranted extension of Randolph, inappropriate for a trial court to make, especially in New York State, which has traditionally upheld the right of the police to rely on a co-occupant’s consent. (See People v Cosme, 48 NY2d 286 [1979].) The answer turns on whether the Randolph decision necessarily elevated the importance of defendant’s refusal to consent at the entrance to his apartment* enough to trump the subsequent consent of his companion, who returned home to the waiting police while defendant remained at the precinct where he had just been taken.
The Randolph Court expressly forbade the police from removing a defendant from his home for the sake of avoiding his objection to the search. In Olmo, which occurred before the Randolph decision came down, the police would have had no reason to keep defendant in his apartment building, nor did they have any motive to circumvent (as yet undecided) Randolph by removing defendant to the precinct. For this reason the court cannot criticize the police action in this case — entitled as they were to be guided by the then current law in this state (People v Cosme, supra) and nation (United States v Matlock, 415 US 164 [1974]). Of course, Randolph must be applied to all cases not yet .finally decided when Randolph was announced, even though Olmo’s facts predate Randolph. (See Teague v Lane, 489 US 288 [1989]; Yates v Aiken, 484 US 211 [1988]; Griffith v Kentucky, 479 US 314 [1987]; People v Eastman, 85 NY2d 265 [1995]; People v Mitchell, 80 NY2d 519 [1992]; People v Pepper, 53 NY2d 213 [1981], cert denied 454 US 967 [1981].)
I conclude that, until and unless a controlling appellate authority should subsequently extend or apply Randolph to an Olmo situation, Randolph does not require suppression. The rationale of the Randolph decision was based on society’s customary expectations regarding privacy in one’s home. And the Randolph Court was emphatic about avoiding unseemly confrontations between disputing occupants, when both are physically present at the same time. The facts in Olmo pre *311 sented no such risk. Here, I see no good reason in law, custom, policy or precedent why defendant’s wife should not, when she returned home and learned about what happened, have the right to cooperate with the police to have a firearm removed as expeditiously as possible from the home she also shared with a young child. I hold that, as long as the police had a valid purpose in removing defendant from his residential building apart from avoiding his objection to the search, his wife retained her authority to consent and the police could reasonably rely on it.
Conclusion
Accordingly, the motion to suppress the firearm is denied. Suppression of defendant’s confession, voluntarily given after proper waiver of Miranda rights, is also denied.

 The record shows that the defendant’s interaction with police initially took place on the landing a floor below the entrance to his apartment from which he had just exited. It is not clear whether defendant came or was brought closer to his apartment door before he was taken away to the precinct. However, in oral argument the prosecutor conceded that this slight ambiguity about how close defendant was to his apartment threshold was not a basis to distinguish Olmo from Randolph.