STATE of Wisconsin, Plaintiff-Respondent,

v.

Deundra R. LATHAN, Defendant-Appellant.†

Court of Appeals

*No. 2010AP1228–CR. Submitted on briefs April 7, 2011.
—Decided June 7, 2011.*

2011 WI App 104

(Also reported in 801 N.W.2d 772.)

† Petition for Review filed.

■■■■■■■■■■■

■■■■

■■■■■■■■■■■
■■

On behalf of the defendant-appellant, the cause was submitted on the briefs of *George M. Tauscheck* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Marguerite M. Moeller*, assistant attorney general.

Before Fine, Kessler and Brennan, JJ.

¶ 1. KESSLER, J.   Deundra R. Lathan appeals a judgment of conviction and an order of the trial court denying his motion to suppress evidence. On appeal Lathan argues that Milwaukee police officers wrongfully arrested him without a warrant after they were denied consent by his mother to search his residence. He further argues that all evidence obtained as a result of his arrest was "sufficiently tainted." We affirm.

## BACKGROUND

¶ 2.   According to the criminal complaint, on December 23, 2007, Milwaukee police responded to complaints of gunshots fired at 2338 N. 15th Street, in the City of Milwaukee.[1] Upon entering the residence, one of the officers observed considerable amounts of blood and noticed a semi-conscious man lying inside of the back door of the house. One officer, apparently observing

---

[1] We note that the criminal complaint states that officers responded to shots fired at 2340 N. 15th Street; however, testimony from Lathan's suppression hearing and jury trial indicates that the shooting actually took place at 2338 N. 15th Street.

that the man had been shot, asked the man who had shot him, to which the man responded that he did not know. The man, later identified as Frankie Hope, died from the gunshot wound.

¶ 3.  Detective Paul Lough was one of the officers investigating Hope's death. On December 25, 2007, Detective Lough interviewed Dejuan Darrough, who stated that the night before Hope's death, Darrough was at the same residence where Hope was murdered. Darrough told Detective Lough that on December 22, 2007, several people were gambling at the residence and taking part in a dice game, including Lathan. Darrough told Detective Lough that he observed two guns in front of Lathan and one in front of Aaron Baker, who was playing dice against Lathan. Darrough further told Detective Lough that an argument broke out between Lathan and Baker regarding whether cheating was taking place. Darrough stated that he left the residence shortly after. Darrough also indicated during the interview that he received a phone call the morning following the dice game from a man he identified as Saene Howze, in which Howze told Darrough that Lathan had killed Hope and had shot Baker in the arm at the same location as the dice game.[2]

¶ 4.  After Lathan was implicated by Darrough, on December 27, 2007, Milwaukee police went to the home of Lucille Hewings, Lathan's grandmother, in an attempt to locate Lathan. One of the officers who went to Hewings's house, Officer Dale Anders, had prior contact with Lathan two months prior to Hope's death in relation to a double homicide. Officer Anders also had

---

[2] Detective Lough testified at Lathan's suppression hearing as to Darrough's statements regarding the phone call from Howze.

multiple prior contacts with Hewings in relation to Lathan's alleged involvement in the double homicide, had been to Hewings's home multiple times and was aware that Hewings was the leaseholder of the home. The officers were also aware that Lathan was a convicted felon.

¶ 5. Officers Anders and Ken Walkowiac arrived at Hewings's house between 1:00 a.m. and 2:00 a.m. and knocked on the door. Lathan's mother, Nonchatlon Lathan,[3] answered the door and allowed the officers to come into the home. When asked whether Lathan was home, she responded that she wasn't sure and would have to check. She also refused the officers' request to go with her and told them to remain in the living room area. She then went to wake up Hewings and went upstairs presumably to find Lathan. Hewings entered the living room area, according to Officer Anders, within approximately five seconds of Nonchatlon leaving. Officer Walkowiac asked Hewings whether Lathan was home, to which she responded "he should be." He then asked whether the officers could go up the stairs to look for Lathan, to which Hewings said "[g]o ahead." The officers proceeded up the stairs, saw Lathan come out of his bedroom, and arrested him. They did not search his bedroom, his home, or his car at the time of the arrest.

¶ 6. Lathan was charged with one count of possession of a firearm by a felon and one count of felony murder. Prior to his trial, Lathan moved to suppress evidence that was obtained "as a result of the warrantless entry" into his home. Specifically, Lathan moved to

---

[3] Lathan's motion to the trial court states Nonchatlon's name as Nonchatlon Hewings; however, Nonchatlon identified her last name as "Lathan" at Lathan's suppression hearing. We use "Nonchatlon" to avoid confusion.

suppress statements he made while in police custody, recorded phone calls made from the House of Correction and any physical evidence seized as a result of a search of his home and car. Lathan's motion argued that officers did not have consent to enter Hewings's home, that Lathan did not consent to a search of the home, and that the officers lacked probable cause to arrest Lathan, thereby making all evidence obtained after his arrest inadmissible.

¶ 7.   The trial court denied the motion at a hearing, finding that Nonchatlon consented to the officers' entry into the home, that Hewings had authority to consent to the officers proceeding up the stairway and that probable cause and exigent circumstances existed to arrest Lathan without a warrant. Officers Lough and Anders testified at the hearing, as did Nonchatlon and Hewings. A jury ultimately convicted Lathan of both charges. This appeal follows. Additional facts are provided as necessary to the discussion.

## DISCUSSION

### I.  Standard of Review.

■

¶ 8.   In reviewing a trial court's order refusing to suppress evidence, we uphold a trial court's findings of historical fact unless they are clearly erroneous. *State v. Roberts*, 196 Wis. 2d 445, 452, 538 N.W.2d 825 (Ct. App. 1995). We will independently determine, however, whether the facts establish that a particular search or seizure violated constitutional standards. *State v. Richardson*, 156 Wis. 2d 128, 137–38, 456 N.W.2d 830 (1990).

## II. Consent.

¶ 9.   Lathan argues that the trial court erred when it denied his motion to suppress evidence because police officers did not have consent to search Hewings's home. Lathan contends that Hewings's consent did not override Nonchatlon's refusal to consent and that his resulting arrest was therefore illegal, making the evidence obtained from that arrest inadmissible. We disagree.[4]

¶ 10.   "The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *State v. Robinson*, 2010 WI 80, ¶ 24, 327 Wis. 2d 302, 786 N.W.2d 463 (one set of quotation marks, brackets, and citation omitted). Warrantless arrests are presumptively unreasonable. *State v. Smith*, 131 Wis. 2d 220, 228, 388 N.W.2d 601 (1986). However, officers can make a valid warrantless arrest in a home if they have consent to enter a home. *State v. Rodgers*, 119 Wis. 2d 102, 107, 349 N.W.2d 453 (1984). Although an arrest warrant and a search warrant protect "distinct interests" under the Fourth Amendment, "[c]ourts generally have assumed that the quantum of evidence required to

---

[4] Lathan's brief-in-chief characterizes the issue as "whether the police were wrong to enter the house by asking and receiving consent from [Lathan's grandmother] after being denied consent by his mother a few moments earlier." The record is clear that Nonchatlon granted the officers permission to enter the house. The issue is really whether the officers had consent to go to the upstairs portion of the house to look for Lathan.

show probable cause is the same whether one is concerned with an arrest warrant or a search warrant." *State v. Kiper*, 193 Wis. 2d 69, 82, 532 N.W.2d 698 (1995).

¶ 11.  Lathan contends his arrest was illegal because the arresting officers obtained consent to proceed up the stairway from Hewings after Nonchatlon refused consent. The issue of whether the consent of one occupant overrides the consent of another occupant, when neither are the subject of the search or arrest, is an issue of first impression in Wisconsin. The United States Supreme Court has clearly stated that "when the prosecution seeks to justify a warrantless [arrest] by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). However, relying primarily on the United States Supreme Court's decision in *Georgia v. Randolph*, 547 U.S. 103 (2006), Lathan contends that his mother was a legitimate co-occupant of the home and had the authority to prevent police officers from proceeding up the stairway, despite his grandmother's consent. Although Lathan acknowledges that *Randolph* expressly declined to consider the exact issue presented here, he nonetheless argues that language in the *Randolph* decision supports his position. We disagree.

¶ 12.  In *Randolph*, the Supreme Court addressed the issue of "whether one occupant may give law enforcement effective consent to search shared premises, as against a co-tenant who is present and states a refusal to permit the search." *Id.* at 108. In *Randolph*, police responded to a domestic dispute call from Janet Randolph in which she said that her husband, Scott

Randolph, had taken their son away. *Id.* at 107. When police arrived at the Randolph home, Janet told the officers that her husband was a cocaine user. *Id.* Scott returned home shortly after the police arrived, explained that he had taken their son to their neighbor's house out of fear that Janet would leave the country with him, and denied Janet's accusations of drug use. *Id.* Janet then volunteered information that "items of drug evidence" were in the house. *Id.* (one set of quotation marks omitted). One of the officers asked Scott for permission to search the house, which Scott denied. *Id.* The officer then turned to Janet, who consented. *Id.* The officers searched the home, found an "item[] of drug evidence," and arrested Scott. *Id.* (one set of quotation marks omitted). The trial court denied Scott's motion to suppress the evidence, though the Court of Appeals of Georgia reversed the trial court and was affirmed by the state's supreme court. *Id.* at 107–08. The Supreme Court of Georgia concluded that the police officers did not have valid consent to enter Scott's home and arrest him after discovering what appeared to be cocaine in his bedroom. *Id.*

¶ 13.　The United States Supreme Court then held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 120. However, the Court expressly refused to address factual situations mirroring Lathan's in which "the constitutionality of . . . a search as to a third tenant against whom the government wishes to use evidence seized after a search with consent of one co-tenant subject to the contemporaneous objection of another" is at issue. *Id.* at 120 n.8. It is clear that the Supreme Court's holding narrowly

243

dealt with disputed consent issues in the context of the subject of the arrest being physically present and personally objecting. "[I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not part of the threshold colloquy, loses out." *Id.* at 105. Lathan was not physically present to object to the officers proceeding up the stairs to the area outside of his bedroom.

¶ 14.   Unlike the issue in *Randolph*, the issue here involves refusal by one tenant and consent by another tenant to police entry to the upstairs portion of a home to look for a third tenant who is not present to either consent or refuse consent. It is undisputed that Nonchatlon allowed the officers into the home and said that she would check whether Lathan was home, but that the officers could not come with her. The trial court, based on the following exchange between the prosecutor and Officer Anders at Lathan's suppression hearing, found that Hewings entered the room shortly after Nonchatlon left to check for Lathan, told the officers that Lathan "should be" home, and consented to the officers going upstairs to look for Lathan:

> [Prosecutor]:   While the two of you were in the living room area, did you come in contact with anyone else?
>
> [Officer Anders]:   After Nonchatlon stepped out of the room, Grandma — I believe her name is Lucille — stepped out of a bedroom in the middle of the lower, walked towards us.
>
> [Prosecutor]:   Did you or Officer Walkowiac talk to her?
>
> [Officer Anders]:   Officer Walkowiac asked if [Lathan] was home. She said he should be. Officer Walkowiac said "Mind if we go check?" She said, "No. Go ahead."

¶ 15. Officer Anders further testified that he knew Hewings, as he had met her on previous occasions when he was looking for Lathan. The officer recognized Hewings as the leaseholder of the premises and stated that while he was acquainted with Nonchatlon, he was unaware that she was living with Hewings on December 27, 2007, because Nonchatlon was not living there during the previous encounters. Nonchatlon later testified that she was only temporarily living with her mother for two months while she was waiting to settle into a new home.

¶ 16. *Randolph* acknowledged that "Fourth Amendment rights [with regard to third-party consent] are not limited by the law of property," but rather, rested on " 'mutual use,' " *id.*, 547 U.S. at 110 (citation omitted), and that "there is no societal or legal understanding of superior and inferior as between co-tenants" unless there is a "recognized hierarchy, *e.g.*, parent and child," *id.* at 114. Nonchatlon acknowledged her mother's authority over the house by waking her mother up after letting the officers into the house. Because the officers were aware that Hewings was the leaseholder of the house, that Nonchatlon had not previously lived there and that Nonchatlon went to wake Hewings up after the officers arrived, it was reasonable for the officers to conclude that Hewings had the authority to consent to them proceeding up the stairs. Lathan was not present to object to the consent. Nonchatlon, who did object, was not the subject of the search.

### III. Probable Cause and Exigent Circumstances.

¶ 17. Lathan alternatively argues that the officers lacked probable cause to arrest him, that no exigent circumstances existed which justified the arrest, and that the evidence derived from the arrest should have

been suppressed. Specifically, Lathan argues that statements made while he was in police custody after his arrest, recorded phone calls made from the House of Correction and physical evidence obtained from a search of his home and car were inadmissible. We disagree.

¶ 18. We concluded that the officers did have consent to proceed up the stairs of Hewings's home and subsequently arrest Lathan. However, even if the officers lacked consent based on Nonchatlon's statements, we conclude that they had probable cause to arrest Lathan for being in possession of a firearm and that exigent circumstances were present which made a delay to obtain a warrant unreasonable.

■■■

¶ 19. "[P]olice may enter a home without a warrant to make an arrest if two circumstances are present. First, the police must have probable cause to make the arrest, and second, there must be an exception to the warrant requirement, such as exigent circumstances or consent to enter." *State v. Tomlinson*, 2002 WI 91, ¶ 20, 254 Wis. 2d 502, 648 N.W.2d 367. "The probable cause requirement in [an] arrest context protects an individual's interest in his or her personal liberty. Thus, the proper inquiry in an arrest challenge is whether probable cause exists to believe that a particular suspect has committed a crime." *State v. Hughes*, 2000 WI 24, ¶ 20, 233 Wis. 2d 280, 607 N.W.2d 621. With regard to exigent circumstances, our supreme court has recognized "four factors which, when measured against the time needed to obtain a warrant, would constitute the exigent circumstances required for a warrantless entry: (1) [a]n arrest made in 'hot pursuit,' (2) a threat to safety of a suspect or others, (3) a risk that evidence would be destroyed, and (4) a likelihood that the suspect would flee." *Smith*, 131

Wis. 2d at 229. The test for determining whether exigent circumstances exist is an objective one. *See Robinson*, 327 Wis. 2d 320, ¶ 30. "We must determine whether the police officers under the circumstances known to them at the time reasonably believed that a delay in procuring a warrant would gravely endanger safety, risk the destruction of evidence, or enhance the likelihood that the suspect will escape." *Id.*

██

¶ 20.   First, we conclude that the officers did have probable cause to arrest Lathan. The trial court found that Darrough's statements, taken in the context of the circumstances surrounding the dice game the night before Hope's death, gave the officers sufficient probable cause to arrest Lathan. We agree.

¶ 21.   According to Detective Lough, Darrough stated that he saw Lathan and Baker playing dice and that an argument ensued between the two while Lathan had two guns within his direct reach.[5] Darrough indicated that he recognized the guns as Lathan's and that Lathan won money from Baker, prompting Baker to say to Lathan:   "If you keep cheating me, I'm going to rob you of everything you've got." Lathan responded:   "If you do that, better give me the homer domer," an expression Detective Lough translated as meaning "shoot him in the head." Darrough further stated that he left the gambling house and was not present when the homicide occurred, but received a phone call the following morning from Howze, informing him that Lathan had shot Baker in the arm and had

---

[5] The criminal complaint states that Lathan had two guns in front of him, while Detective Lough testified that Lathan had a gun on either side of him. Either way, two guns were directly in Lathan's reach.

247

killed Hope. Darrough's statements regarding Lathan's proximity to guns he believed to be Lathan's, along with Darrough's statements about Howze's phone call, as well as the officers' knowledge of Lathan's arrest two months prior to Hope's death, gave the officers probable cause to believe that Lathan committed the crime of being a felon in possession of a firearm.[6] In addition, the officers reasonably suspected Lathan of a homicide.

■

¶ 22.  Second, we conclude that exigent circumstances justified the officers' movement up the stairway to look for Lathan. Upon entering the home, Nonchatlon indicated that Lathan "might be" upstairs. When Hewings arrived she said that Lathan "should be" upstairs. The officers acted reasonably in going up the stairway at that point because:   (1) Nonchatlon was no longer in the officers' sight and could have been alerting her son as to their presence and facilitating his escape; (2) the weapon the officers understood to be owned by Lathan and used to kill Hope and shoot Baker had not been recovered, giving officers reason to believe that Lathan was still armed and the safety of themselves and others in the house was endangered; and (3) Lathan's arrest two months prior to Hope's death in connection with a double homicide gave additional reason to suspect Lathan of being armed and dangerous. It would be unreasonable to expect the officers to wait in Hewings's living room and potentially endanger themselves and others during the time it would take to procure a warrant to go up the stairway and look for Lathan.

¶ 23.  Because we conclude that Lathan's arrest was lawful, we need not consider Lathan's arguments

---

[6] *See* Wis. Stat. § 941.29(2); *see also* Wis JI—Criminal 1343.

premised on what he considered an unlawful arrest.[7] We note that no search was conducted incident to Lathan's arrest and no evidence was actually obtained at that time. Lathan's statements to officers were made six hours after his arrest. Lathan does not claim that *Miranda*[8] warnings were not given or that his statements were not made voluntarily.

## CONCLUSION

¶ 24. Because we conclude that the officers had valid consent to proceed up the stairway of Hewings's home, Lathan's arrest was not illegal. We further conclude that the officers had probable cause to believe that Lathan was a felon in possession of a firearm and that exigent circumstances justified his warrantless arrest. As such, evidence obtained after Lathan's arrest was admissible. We affirm.

*By the Court.*—Judgment and order affirmed.

---

[7] Lathan specifically challenges the admissibility of his statements to police, his recorded phone calls from the House of Correction and any evidence obtained from his home and car.

[8] *See Miranda v. Arizona,* 384 U.S. 436 (1966).