[Cite as *State v. Cook*, 2013-Ohio-5449.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-130242 |
| | | TRIAL NO. B-1206956 |
| Plaintiff-Appellant, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| CHRISTIAN COOK, | : | |
| | | |
| Defendant-Appellee. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  December 13, 2013

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Rachel Lipman Curran*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Brian Goldberg*, for Defendant-Appellee.

Please note:  this case has been removed from the accelerated calendar.

**DINKELACKER, Judge.**

{¶1} Defendant-appellant Christian Cook was indicted for three counts of burglary and two counts of receiving stolen property. He entered not guilty pleas to all the charges and filed two separate motions to suppress the eyewitness identification of John Aschraft, Cook's statements to police, and the evidence that stemmed from the police's warrantless search of an apartment Cook shared with his girlfriend. Following the denial of his motions to suppress, Cook pleaded no contest to three counts of burglary. In exchange, the state dismissed the two receiving-stolen-property charges. The trial court sentenced Cook to a four-year prison term for each burglary charge and ordered that the terms be served consecutively, for a total of 12 years in prison.

{¶2} Cook raises five assignments of error in support of his appeal. He claims that the trial court erred in failing to suppress the evidence police obtained during a warrantless search of his apartment, the eyewitness identification of a victim of the third burglary, and his statements to police; that the trial court failed to properly notify him of his postrelease-control obligations at sentencing; and that the trial court failed to substantially comply with Crim.R. 11 by failing to properly advise him of his postrelease-control obligations and that he could serve consecutive prison terms. Finding merit only in his fourth assignment of error, we remand this case to the trial court for the sole purpose of informing Cook of his postrelease-control obligations in accordance with R.C. 2929.191. We affirm the trial court's judgment in all other respects.

## Testimony at the Hearing on the Motions to Suppress

{¶3} At the hearing on Cook's motions to suppress, Jill Schramm, a Cincinnati police detective assigned to the District 2 Investigative Unit, testified that

2

she had investigated three burglaries on Shaw Avenue that had occurred on October 8, October 11, and October 12, 2012. When she arrived at the scene of the October 12 burglary, she learned that the homeowner, John Ashcraft, had surprised the burglar, who was trying to leave through a door to a deck. In his haste to leave, the burglar had dropped a number of items, including a receipt for Spree candy that had been purchased at a nearby Shell gas station, a lanyard with a set of keys, and a packet of suboxone, a prescription medication, which had a food stamp card for Lindsay Bellville inside it. The police determined that the keys matched an apartment complex a few doors down from the residence that had been burglarized. They then knocked on the door to the apartment, but no one answered.

{¶4} When Schramm returned to District 2, she was advised that officers had developed Cook as a suspect for the burglary, and that they were putting together a photographic array to show Ashcraft. Detective Schramm testified that she was only given Cook's name, and did not know what he looked like. When the array was complete, she called Ashcraft and asked him to come to the police station.

{¶5} Three hours after the burglary, Schramm showed Ashcraft the photographic array, which included six photographs of men that shared similar facial features and characteristics. Prior to showing him the array, she read Ashcraft instructions and asked him to sign a form, indicating his understanding of those instructions. She then laid the six photographs on the table in two separate rows. She did not emphasize any one of the photographs because she did not know what the suspect looked like. Ashcraft pulled two of the photographs out of the group. After 30 seconds, he chose the fifth photograph from the array, and said, "This looks like him." Detective Schramm then had Ashcraft initial a form acknowledging that he had chosen the fifth photograph. When she gave the photograph Ashcraft had

selected to two other police officers associated with the investigation, she was informed that Ashcraft had selected Cook's photograph from the array.

{¶6}   At that point, officers knew Cook was living with his girlfriend, Lindsay Belville.  They went to the apartment the two shared, and knocked on the front door, but no one answered.  The p0lice then returned to District 2 and called Belville's relatives.   Belville's grandparents brought her to the police station for questioning.

{¶7}   Although Belville was not arrested, Detective Schramm informed her of her *Miranda* rights and explained that police believed Cook had perpetrated burglaries in the area and had stolen property from the burglaries inside their apartment.  Belville told Schramm that Cook had left the apartment and she did not know where he had gone.   She identified a cell phone that had been left at the first burglary as belonging to Cook.  She also told Schramm that some of the property that had been taken in the burglaries was in the apartment. Schramm asked Belville if the police could enter the apartment to search for the stolen property.

{¶8}   At that point, Belville agreed to accompany police to the apartment. Once there, Detective Schramm read a written consent to search form to Belville and asked her for consent to allow the investigators to enter the residence and search for stolen property.   Belville signed the form.   Schramm denied threatening or coercing Belville to obtain her consent to search the apartment.

{¶9}   Belville then stood in the parking lot with her grandparents while police entered the apartment.  Upon entering the residence, the police found Cook and arrested him based on Ashcraft's eyewitness identification as the perpetrator of the burglary earlier that morning.  Schramm testified that Cook "did not want to comply. He almost got tased. He didn't want to put his hands behind his back."

4

Police removed Cook from the apartment and took him to District 2 for questioning. The police then asked Belville to enter the apartment. Once inside, Belville helped police identify property that had been taken in the October 8 and October 11 burglaries.

{¶10} When Schramm returned to District 2, she met with Cook. She notified him of his *Miranda* rights, and asked him if he would be willing to talk about the incidents that had occurred that day and the previous day. Cook indicated that he was willing to talk. He did not ask for an attorney or invoke his right to remain silent. According to Schramm, Cook understood the questions she asked him and gave appropriate responses.

{¶11} Schramm recorded the interview, which was played during the suppression hearing. At the beginning of the interview, Detective Schramm asked Cook if he was feeling "ok." She told Cook that he was "slurring" his words. Later, Schramm commented that Cook sounded better, but that he still looked "dope sick." Cook told Schramm that he had taken two Klonopin pills when he heard police knocking on the apartment door. When she asked him what effect this medicine had upon him, he said they were "nerve pills and don't give you any buzz. They will slow you down."

{¶12} Cook then argued with Schramm over whether he had a drug problem. He eventually admitted that he was addicted to drugs, including suboxone. Schramm told Cook that police had recovered a packet of suboxone at the scene of the third burglary.

{¶13} During the course of the interview, Cook admitted he had previous experience with law enforcement. He admitted to being at the Shell gas station the morning of the third burglary, but stated that he went straight home and went to

bed. He disclaimed any responsibility for that burglary or the other two burglaries. He claimed he had only been purchasing stolen property, and that the police had arrested the wrong man. He told Schramm the perpetrator of the burglaries was actually a man named Tyler Goodman. When Schramm informed Cook that she did not believe him, he became very argumentative. Schramm then terminated the interview.

{¶14} John Ashcraft testified that around 6:50 a.m. on October 12, 2012, he was upstairs sleeping in the home he shared with his pregnant wife and one-year-old daughter, when he heard noises downstairs. When his dog started barking, he realized someone was in his home. As he got to the bottom of the stairs, he saw a man trying to leave through the back door of his home. He yelled for the man to leave and kept moving towards the kitchen.

{¶15} When he got to the edge of the kitchen, the man, who had now opened the door, turned to look at him and said, "Sorry, wrong house." The man then ran out of the door. Ashcraft said he was ten to 12 feet away when the intruder turned around and spoke to him. Ashcraft saw his face for a couple of seconds. He was very focused on making sure the person was leaving his home.

{¶16} After the intruder left, Ashcraft ran and shut the door. His wife called the police. He couldn't recall if he had given police a description of the intruder. Around 9:30 a.m. that same morning, he met with Schramm to look at some photographs.

{¶17} Prior to showing Ashcraft the photographs, Schramm read him some instructions from a sheet of paper, which included the following:

In a moment, I will show you a group of photographs. This group of photographs may or may not contain the photograph of the alleged

perpetrator of the offense now being investigated. I do not know who the alleged perpetrator of the offense now being investigated is. I do not know which, if any, of the photographs is of the alleged perpetrator.

{¶18} She then showed him six different photographs, which he immediately narrowed down to two. He looked at those two photographs for 30 seconds and then said, "I think this is the one." He handed Schramm the photo. He testified that he was pretty confident that he had identified the person he had seen in his home earlier that morning. He further stated that at no time did Schramm point to any specific photograph in the array and ask him if it was the person he had seen.

{¶19} Lindsay Belville testified that she met with police on October 12, 2012. She said Schramm had called her grandparents' home and asked to speak with her. Her grandparents had then taken her to District 2. According to Belville, Detective Schramm took her to an interrogation room and asked her to sign a paper, which stated that she could have an attorney present if she needed one. Schramm then started asking her questions about Cook. She became very anxious. She asked Schramm for an attorney, but Schramm ignored her request and kept asking her questions.

{¶20} According to Belville, Schramm told her that she had the choice to sign a search warrant or that she would have "the cops kick in her door." She also testified that Schramm had told her that if she did not cooperate, she could be charged with "everything" and then her two-week-old daughter would be removed from her custody. As a result, she didn't feel like she had a choice, she had to give police consent to search the apartment.

**{¶21}** Belville then returned with the police to her apartment on Shaw Avenue. She signed a consent form for the police to search her apartment. At that point, she did not know if Cook was still in the apartment. She only knew he had been there previously. She denied telling Schramm that Cook had left the apartment.

**{¶22}** During cross-examination, Belville admitted that she had lived at the apartment with Cook and her daughter, and that both her name and Cook's name were on the lease. She also admitted that her signature was on the consent-to-search form.

### Search of Cook's Apartment

**{¶23}** In his first assignment of error, Cook argues the trial court erred in failing to suppress the evidence recovered during the warrantless search of his apartment.

**{¶24}** When reviewing a trial court's ruling on a motion to suppress we employ a two-part analysis. First, we review the historical facts found by the trial court for clear error and give due weight to the inferences drawn from those facts by the trial court. *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Second, we must independently decide whether the facts meet the applicable legal standard. *See State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71.

**{¶25}** Cook first argues that Belville's consent to search the home was not voluntarily given. He relies on Belville's testimony at the suppression hearing that the police had threatened to arrest her and take her child if she did not consent to a search of the apartment. Detective Schramm, however, denied threatening or coercing Belville to obtain her consent to search the apartment. She testified instead that Belville had voluntarily consented to the search.

{¶26}    In its written decision overruling Cook's motions to suppress, the trial court stated that in weighing Belville's testimony at the suppression hearing with the testimony presented by Schramm, it found Schramm's testimony to be more credible.  Under these circumstances, we cannot conclude that the trial court erred in finding Belville's consent to be voluntary. *See State v. Hunter,* 1st Dist. Hamilton No. C-960431, 1997 Ohio App. LEXIS 630, *3-4 (Feb. 26, 1997); *see also State v. Ayoub*, 498 F.3d 352, 542, (6th Cir.2007).   We, thus, find Cook's first argument meritless.

{¶27}    Cook next argues that the police, upon entering the apartment and finding him there, should have asked for his consent to search the apartment.   He further argues that under the circumstances it was impossible for him to expressly refuse to consent to the search because it was a hostile situation where he was almost tased upon the officers' entry into the apartment.   Thus, he contends that his actions in refusing arrest amounted to a refusal to allow police to enter the residence.

{¶28}    The difficulty with Cook's argument, however, is that the case he relies upon, *Georgia v. Randolph*, 547 U.S. 103, 121, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), is factually distinguishable.  *Georgia* involved a defendant who had expressly refused to consent to a police search of his residence, followed by a third-party who later gave police consent to search.   The United States Supreme Court held that under those narrow circumstances, when "a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search." *Id.*   As a result, the Supreme Court upheld the suppression of evidence resulting from the warrantless search.  *Id.*  Federal courts however, have refused to extend *Georgia's* holding to a potential objector who stands by mute.  *See United States v. Stanley*, 351 Fed.Appx. 69, 72, (6th Cir.2009).

{¶29} Thus, absent a contemporaneous objection from Cook, Belville's consent to search the apartment was sufficient to permit the police to enter their apartment. *See State v. Pugh*, 2d Dist. Montgomery No. 25223, 2013-Ohio-1238, ¶ 10. Cook admits he made no express objection to the search of the apartment. He merely resisted arrest. Cook cites no authority, and we are not aware of any, that would support his assertion that resisting arrest is tantamount to an express refusal of consent to search. *Compare United States v. Tatman*, 397 Fed.Appx. 152, 161 (6th Cir.2010) (holding that a defendant's statements to police at the top of the stairs that a cotenant had no right to let them in and that they had no right to be there were sufficient to revoke the cotenant's earlier consent, and distinguishing the case from cases where the defendant had made no such statement). And contrary to Cook's assertions, the police were not required to obtain his express consent before searching the apartment. *See Pugh* at ¶ 10; *Stanley*, 351 Fed.Appx. at 72. As a result, we cannot say the trial court erred in concluding that Belville's consent to search gave the officers the legal authority to search the apartment. We, therefore, overrule his first assignment of error.

## Eyewitness Identification

{¶30} In his second assignment of error, Cook argues the trial court erred in failing to suppress the eyewitness identification of John Ashcraft, the victim of the third burglary.

{¶31} A court should suppress a pretrial identification only if the circumstances surrounding the identification were unnecessarily suggestive and the identification was unreliable under the totality of the circumstances. *State v. Waddy*, 63 Ohio St.3d 424, 439, 588 N.E.2d 819 (1992).

{¶32}   Cook argues that the lineup was unnecessarily suggestive because Schramm, who had administered the photographic lineup was not a "blind administrator" as required under R.C. 2933.83.   He also claims that Ashcraft's identification was unreliable because Ashcraft did not have enough time to view Cook during the burglary.

{¶33}   R.C. 2933.83(B) provides that "any law enforcement agency or criminal justice entity that conducts * * * photo lineups shall adopt specific procedures for conducting the lineup."   One of those procedures involves using a "blind" or "blinded administrator" to conduct the lineup. R.C. 2933.83(B)(1).  A " 'blinded administrator' means the administrator may know who the suspect is, but does not know which lineup member is being viewed by the eyewitness."   R.C. 2933.83(A)(3).  When the state fails to comply with 2933.83, a defendant's remedy is not suppression, but the opportunity for cross-examination at trial.  *See State v. Ruff*, 1st Dist. Hamilton No. C-110250, 2012-Ohio-1910, ¶ 5; R.C. 2933.83(C)(1).

{¶34}   Here, Schramm testified that she had been given Cook's name as a suspect in the burglaries, but that she did not know what he looked like.  She testified that she did not prepare the photo array and did not know which photograph in the array depicted Cook.   She further testified that she had read an advisement to Ashcraft, which stated as much prior to showing him the array.   Thus, there is no evidence to demonstrate that Schramm was not a "blind administrator" as contemplated by the statute.   Therefore, the trial court properly denied Cook's motion to suppress on this basis.   Cook, moreover, points to no other defect in the lineup that would support his argument that the photo array was unduly suggestive.

{¶35}   Cook also argues that Ashcraft's identification was unreliable because Ashcraft had testified that it was dark inside his home and that he had seen the

intruder only a second or two from ten-12 feet away, and Ashcraft had said, "I think this is the one" when selecting Cook's photograph from the array. But because Cook has not demonstrated that the array was impermissibly suggestive, we need not reach the reliability of Ashcraft's identification. *Waddy*, 63 Ohio St.3d at 439, 588 N.E.2d 819. As a result, we overrule his second assignment of error.

### Voluntariness of Cook's Statements

{¶36} In his third assignment of error, Cook argues that the trial court erred in failing to suppress his statements to Schramm. He argues that because he was under the influence of drugs at the time of the interview, he could not have knowingly and voluntarily waived his right to remain silent. He points to Detective Schramm's testimony at the suppression hearing that he had admitted during the police interview that he had taken two Klonopin pills before he had been arrested, and that he had looked "dope sick" during the interview.

{¶37} In determining whether a defendant's statement is made voluntarily, courts employ a "totality of the circumstances" test. *State v. Wiles*, 59 Ohio St.3d 71, 81, 571 N.E.2d 97 (1991). They "consider a variety of factors including the age, mentality and prior criminal experience of the accused; the length, intensity, and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement" to determine whether the statement was the product of a free and deliberate choice, or the result of police coercion and overreaching. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229 at ¶ 32; *see also State v. Edwards*, 49 Ohio St.2d 31, 40-41, 358 N.E.2d 1051 (1976); *Colorado v. Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 93 L.Ed.2d 473, (1986). "The suppression of a statement is properly denied on the basis of its voluntariness where the record discloses substantial evidence upon which the trial

court, applying the above criteria, might have concluded, by a preponderance of the evidence that the statement was made voluntarily." *State v. Rogers*, 1st Dist. Hamilton No. C-000299, 2000 Ohio App. LEXIS 6203, *8 (Dec. 29, 2000).

{¶38}  Prior to interviewing Cook, Detective Schramm advised him of his constitutional rights, and Cook admitted that he understood them.  Detective Schramm's interview with Cook was recorded, and a copy of the interview was played at the hearing on the motion to suppress.  While Schramm described Cook as appearing to be ill, a condition she described as "dope sick" and attributed to drug addiction, she testified that he understood her questions and gave appropriate answers.  Moreover, at no time during the interview did Cook assert his right to counsel or to remain silent.  Instead, he chose to verbally spar with Schramm and to try to persuade her of his innocence.  Schramm concluded the interview when Cook became irate that she did not believe him.

{¶39}  Cook's statements during the interview are inconsistent with his argument that his will was so overborne by drugs that he did not knowingly and voluntarily choose not to remain silent.  *See State v. Israel*, 1st Dist. Hamilton No. C-961006, 1997 Ohio App. LEXIS 4413, *22 (Sept. 26, 1997); *State v. Stewart*, 75 Ohio App.3d 141, 147-48, 598 N.E.2d 1275 (11th Dist.1991).  Nor does the record reflect that Cook's statements were the product of police coercion.  As a result, we cannot say the trial court erred in concluding that under the totality of the circumstances, Cook's statements were voluntary and should not be suppressed.  We, therefore, overrule his third assignment of error.

**Notification of Postrelease Control at Sentencing Hearing**

{¶40} In his fourth assignment of error, Cook argues that his sentence is contrary to law based upon the trial court's failure to orally notify him of his postrelease-control obligations at the sentencing hearing.

{¶41} R.C. 2967.28(B) provides as follows:

> Each sentence to a prison term for * * * a felony of the second degree * * * that is not a felony sex offense shall include a requirement that the offender be subject to a period of post-release control imposed by the parole board after the offender's release from imprisonment. * * * Unless reduced by the parole board pursuant to division (D) of this section when authorized under that division, a period of post-release control required by this division for an offender shall be of one of the following periods:
>
> * * *
>
> (2) For a felony of the second degree that is not a felony sex offense, three years[.]

{¶42} R.C. 2929.19(B)(3)(c) requires the sentencing court to "notify the offender at the sentencing hearing that he will be supervised pursuant to R.C. 2967.28 and that the parole board may impose a prison term of up to one-half of the prison term originally imposed on the offender if he violates supervision or a condition of his postrelease control." *See State v. Williams*, 1st Dist. Hamilton No. C-081148, 2010-Ohio-1879, ¶ 20.

{¶43} When a sentencing court fails to advise an offender about postrelease control at the sentencing hearing, and the offender is sentenced after July 11, 2006,

the effective date of R.C. 2929.191, the trial court violates its statutory duty, and that part of an offender's sentence that is related to postrelease control is void. *See State v. Brown*, 1st Dist. Hamilton Nos. C-100390 and C-100310, 2011-Ohio-1029, ¶8-9, quoting *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, ¶ 26. To remedy the postrelease-control defect, the trial court must employ the sentencing procedures set forth in R.C. 2929.191. *See Brown* at ¶ 8.

{¶44} Here, the trial court failed to orally advise Cook that he would be subject to a mandatory period of three years of postrelease supervision following his release from prison, and that the parole board could impose a prison term of up to one-half of the stated prison term originally imposed, if he violated supervision or a condition of his postrelease control. *See* R.C. 2929.19(B)(3)(c) and 2967.28(B). As a result, we sustain Cook's fourth assignment of error.

### Plea Hearing

{¶45} In his fifth assignment of error, Cook argues that his no-contest pleas were involuntary because the trial court failed to advise him of the maximum possible aggregate sentence in that the trial court failed to address consecutive sentences and it misstated that he "could be" subject to three years of postrelease control where postrelease control was mandatory.

{¶46} Cook first argues the trial court failed to comply with Crim.R. 11(C)(2)(a) as it only informed him of the maximum prison term available for each offense, but did not inform him that it could impose consecutive sentences under R.C. 2929.14(E)(4). In *State v. Johnson*, 40 Ohio St.3d 130, 532 N.E.2d 1295 (1988), syllabus, however, the Ohio Supreme Court held that when a trial court has the option to impose consecutive sentences pursuant to R.C. 2929.14(E)(4), its failure to inform a defendant who pleads guilty that his sentences may run consecutively rather than concurrently is not a

violation of Crim.R. 11(C) and does not render the plea involuntary. *See also State v. Clark*, 1st Dist. Hamilton No. C-010532, 2002-Ohio-3135, ¶ 5-8. We, therefore, find Cook's first argument meritless.

{¶47} Cook also argues that the trial court failed to substantially comply with Crim.R. 11(C)(2)(a) when it failed to adequately inform him of his postrelease-control obligation. The Ohio Supreme Court has held that if a trial judge imperfectly explains nonconstitutional rights, such as the right to be informed of the maximum possible penalty and the effect of the plea, a substantial compliance rule applies. Under this standard a slight deviation from the text of the rule is permissible so long as the totality of the circumstances indicates that the "the defendant subjectively understands the implications of his plea and the rights he is waiving." *State v. Clark*, 119 Ohio St.3d 239, 243, 2008-Ohio-3748, 893 N.E.2d 462, ¶ 31.

{¶48} While the trial court initially misinformed Cook that he would be subject to a discretionary three-year term of postrelease control, the assistant prosecuting attorney clarified that the term was actually mandatory. The trial court agreed with the prosecuting attorney's statement. Cook's plea form correctly stated that he would be subject to a mandatory three-year term of postrelease control. Cook, moreover, has failed to demonstrate any prejudice from the trial court's initial misstatement. *See id.* at ¶ 32. As a result, we overrule his fifth assignment of error.

{¶49} Having sustained Cook's fourth assignment of error, we reverse the trial court's judgment, and remand this cause for the trial court to notify Cook of his postrelease-control obligations in accordance with R.C. 2929.191. We affirm the trial court's judgment in all other respects.

Judgment affirmed in part, reversed in part, and cause remanded.

**HENDON, P.J,** and **CUNNINGHAM, J.,** concur.

Please note:

The court has recorded its own entry this date.

